LEVI G. TODD ET AL., APPELLEES, V. CASS COUNTY ET AL., APPELLANTS.

[FILED NOVEMBER 25, 1890.]

1. **Elections:** ILLEGAL VOTING: EVIDENCE REQUIRED. In order to establish the fact that illegal votes were cast at an election in a specified voting precinct, proof must be offered by one or more witnesses having actual knowledge of such fact that persons who were not legal voters did actually vote at such election, and such witness or witnesses must designate such illegal voters. When the proof merely tends to show that the witnesses do not know all the legal voters in the precinct, and therefore fails to designate certain voters as illegal, it is insufficient to authorize the rejection of such votes as illegal.

2. ———: ———: PLEADING. In contesting an election in court the allegations of the petition and proof must correspond; in other words, the plaintiff must set forth in his petition the names of the persons whose votes are claimed to be illegal, in order that issue may be taken thereon. If such names are unknown at the time of bringing the action, the contestant afterward should obtain leave of court to amend his petition, giving a list of the names of voters claimed to be illegal, and it is the duty of the court to designate from the evidence the particular persons who have voted unlawfully.

3. ———: BALLOTS: PRESUMPTION OF LEGALITY. Where ballots have been cast in the mode provided by law, the presumption is that they are legal, and this presumption cannot be overturned by vague, indefinite, and uncertain testimony.

APPEAL from the district court for Cass county. Heard below before BROADY, J.

*T. M. Marquett, Byron Clark, J. B. Strode, A. N. Sul-
livan,* and *Mathew Gering,* for appellants, cited: *People v.
Cicott,* 16 Mich., 283; *Sudbury v. Stearns,* 21 Pick.
[Mass.], 148; *Ex parte Murphy,* 7 Cow. [N. Y.], 153;
*People v. Tuthill,* 31 N. Y., 550; *Judkins v. Hill,* 50 N.
H., 140.

*E. H. Wooley,* and *J. R. Webster, contra,* cited: Mc-
Crary, Elections [3d Ed.], secs. 547, 548; *Knox v. Blair,*
1 Bart 521; Brightley, Election Cases, 493; *Russell v.
State,* 11 Kan., 308; *Tarbox v. Sughrue,* 12 Pac., Rep.,
939; *Patten v. Coates,* 41 Ark., 111; *Burr v. Boyer,* 2 Neb.,
267.

MAXWELL, J.

This is an action to contest an election held in Cass
county on the 8th day of June, 1889, for the purpose of
voting bonds to erect a court house in said county. It is
alleged in the petition:

"Said election was held in the county of Cass on the
8th day of June, 1889, pursuant to notice given therefor,
and the whole number of votes cast for the proposition
submitted was 5,953, of which the proposition incumbent
received 3,078 in favor thereof, and there were cast against
said proposition incumbent 2,875 votes, and upon the can-
vass of said votes said proposition incumbent had an ap-
parent majority of 203 votes; and said proposition, by the
board of canvassers, organized and held by the county clerk,
at the city of Plattsmouth, on the 12th day of June, 1889,
was declared to have received an apparent majority of 203
votes, and the result of said canvass was by the board of
canvassers signed and filed with the board of county com-
missioners of the said county of Cass, and said board of
canvassers declared said proposition carried." The peti-
tion contains the names of fifty persons who, it is alleged,

Voted in the First ward of said city and were not legal voters; also the names of fifty-four such persons whom, it is alleged, voted in the Second ward, and fifty-seven persons, whose names are set out, that it is alleged were not legal voters, but voted in the Fourth ward.   No names of alleged illegal voters are set forth as having voted in the Third ward, and there is no contest over the Fifth ward. The reason given for not setting out the names of other alleged illegal voters is, that the plaintiffs did not have access to the poll-books of the Third ward.

The county of Cass in its answer:

"First—Denies all the facts stated in the contestant's petition.

"Second—Alleges that at a point (naming it), which had formerly competed for the county seat, there were 205 illegal votes cast, giving a large number of names, all of which were cast against said bonds.

"Third—That at other points named illegal votes to the number of more than 150 were cast against said bonds."

It is unnecessary to consider the answer in the case farther than the general denial, as on the trial, upon the conclusion of the testimony offered by the contestants, the defendant moved for a nonsuit on the ground "that the evidence adduced by the plaintiff in this case does not sustain the allegations of the petition, and is not sufficient to sustain a finding in favor of said plaintiff and against these defendants, or any of them."

The court thereupon took the matter under advisement, and afterwards filed a lengthy written opinion which, so far as relates to the cause for declaring the election annulled, is as follows: "At the polls in the contested wards, on the part of many on the outside, there was a very active desire to increase the vote for the bonds without regard to whether the same were legal or illegal votes.   There was not present, either in or out the election board, any opposing force to prevent illegal voting.   The judges of elec-

Todd v. Cass County.

tion hid behind the erroneous supposition of the law, that it was not their duty to challenge, but, on the contrary, that it was their duty to receive all votes offered by men that were not challenged by outsiders. There was a moral or an immoral influence around the polls sufficient to guard against illegal votes against the bonds, and so the gates were left wide open for all men to vote who would offer ballots. This was weakening to that presumption of legality. Then, to further weaken that presumption, the plaintiffs offer in evidence the records showing the men on the tax list of personal property, and polls for spring of 1889 in the several wards of the city, and the record of votes at the city election in April, 1889, in the several wards, with evidence tending to show there was a spirited contest on members of school board at that election: the records showing the number of votes and the names of the voters of the several wards of the bond election in dispute; the registry of voters in the several wards in dispute for the general fall election of 1889, and the records showing the number of votes in the several wards at the November, 1889, election. The following is a recapitulation of those records, with some deductions and stated results:

"ABSTRACT OF DOCUMENTARY PROOFS.

| | City vote, spring election, 1889. | Tax list taxable and polls, 1889. | Vote bond election contested June, 1889. | Registered vote October, 1889. | Vote general election, 1889. | Excess over highest other figure, 1889. |
|---|---|---|---|---|---|---|
| First ward...................... | 212 | 141 | 522 | 239 | 230 | 283 |
| Second ward ................... | 256 | 147 | 516 | 291 | 291 | 225 |
| Third ward...................... | 272 | 231 | 627 | 296 | 248 | 325 |
| Fourth ward ................... | 227 | 206 | 503 | 276 | 269 | 227 |
| Fifth ward...................... | 86 | 82 | 128 | 98 | 99 | 29 |
| | 1053 | 807 | 2296 | 1200 | 1183 | 1089 |
| Excess.................... | 1243 | 1489 | | 1096 | 1113 | |

" These defendants' statements certainly have a tendency to maintain plaintiff's assault against that presumption of regularity at the bond election in June. It shows that there was then voted more than double the men who paid poll or personal tax and nearly double as many as they voted before or after. The circumstances surrounding the fall election of 1889, as shown by the evidence, would tend to bring out a full vote.

" There is another record that should be noticed—that concerning census. The law provides for the taking of the census of the children with school age, giving sex, name, age, residence, etc., as means of verification of correctness thereof. This was done according to law, and the number of children with school age in the district in which Plattsmouth is situated was 1,928. The plaintiffs brought this out for the purpose of showing the opportunity of the witnesses for general acquaintance with the electors, and for the same purpose showed that the witness, at the request of the city officials, took the census of the town by taking the names of the head of the family as to the number of the family, without giving name, age, sex, or residence of individuals or other means of verification of correctness. The plaintiffs asked for the number of children but not for the population. This was asked for by defendants while cross-examining, although not strictly cross-examination. The census of the children is authorized by law and is a legal and sworn record and must be admitted. The census of the population was unauthorized by law and was hearsay, and during its taking it is safe to say that while one eye was on the census the other was on the county seat. It cannot be taken as a census nor as a sworn count.

"Still further, the plaintiffs offer, to support their attack against that presumption, oral testimony of a negative character. Their witnesses, being interested against them, are necessarily chosen with reference to high character as a guarantee that they will be truthful, and with good

opportunities of general and extended acquaintance with the voters, same having been judges of election in dispute when they saw the men and heard their names announced, and some assessors, and school census takers, the different vocations of life among the men of the place being well represented. They ask these witnesses if they knew or know of these challenged voters. They fail to know or know of more than twice the number. of 203, the majority canvassed by the bonds.

"These witnesses, in estimating the proportion of the voters within their knowledge, fixed at a very small fraction, safe for defendants, but give no sufficient reason for the estimate; the examination throughout of each of them showing a very extensive acquaintance with the names not challenged. This was satisfactorily illustrated in the examination of ex-Mayor Johnson and Barber Boone, who were asked for knowledge on both the challenged and unchallenged lists, and from the utter unreliability of their estimates of the proportion of the votes known of by them. The many striking circumstances of the want of knowledge of these witnesses and to the records of the same challenged votes, make the witnesses and the records go together much stronger than either could go alone. The vote in June was out of all proportion to the other votes, the records, and out of the knowledge of those of general knowledge who ought to know. If the bond vote was legal the conclusion is irresistible, that there was a remarkable temporary sojourn of voters at that time, never discovered to tax, to work, or to vote except on that occasion. This event could not have escaped attention such as to track up in evidence and find where to place them. Nothing of this sort is done, except the repeated suggestion of shop hands and railroad employes. But these men are substantially all found, and these undiscovered votes are not to be any great extent among them, but on the contrary they are known residents, voters, and taxpayers and unchallenged

voters. This increases the mystery of so many undiscovered voters. That some of the undiscovered voters cast illegal votes is beyond doubt. Whether they were by men not entitled to vote, or by legal voters repeating under assumed names, as the evidence sufficiently shows that the Italians, otherwise called Dagos, did, and under circumstances authorizing the belief that they were not legal voters at all, cannot be determined. How many illegal votes were cast? The number cannot be named to a certainty. Were there 203? The number of strangers to the witnesses, and all the records except of that election are about three times that number. All the legal votes must be counted. They will be counted for the bonds. The evidence is sufficient to find the maximum number of legal votes· in Plattsmouth at the time of the election in dispute, and the excess in the election in dispute are that may be fairly said to have been illegal.

"In view of all the evidence, I fix, by that maximum of votes, 1,928, the number of children of school age in the whole district (too high an estimate for other places in Nebraska). The evidence is sufficient to show that the Fifth ward, which is not contested, cast at the election in dispute substantially a full vote, so that it cast at that election not enough legal votes to change their estimates or results.

"This leads to the conclusion that more than 203 illegal votes were cast in the other four wards. I am constrained to feel that the proofs are sufficient to prevail against that presumption of regularity, so as to call for evidence from the other side, which they do not offer.

"I therefore find that in this court of equity the bond election of June 8, 1889, cannot stand. It is therefore annulled at the cost of Cass county. Defendants except to all.                    J. H. BROADY, *Judge*."

Charles S. Twiss, the witness who took the school census in March, 1889, and also in March, 1888, was called

as a witness by the plaintiffs, and testified that he had lived in the Third ward of Plattsmouth for ten years; that he had been assessor in that ward a number of times, and that in March, 1889, when taking the census of children of school age in the city, he had also, under the direction of the city council, taken an enumeration of the persons residing in the city. This testimony was elicited evidently to show his knowledge of the people residing within the limits of the city. On cross-examination he testified as follows:

Q. Mr. Twiss, you may state as a matter of fact if a larger number of persons have their homes here while their employment is outside of the city.

A. Yes, a great many of them.

Q. You are not personally acquainted with these folks, are you.

A. No. I believe a good many of them are working on farms and their families are living here.

Q. State whether or not a large number of men whose homes are in Plattsmouth are employed in the service of the Burlington & Missouri railroad as machinists, carpenters, repairers, stone masons, brick masons, etc., whose homes are here and their employment elsewhere.

A. Yes.

Q. How did you take that list, or how did you keep count of the population here in the city of Plattsmouth last spring; did you keep a list of all their names, or just the numbers?

A. Of the numbers; I didn't keep the names. I took the numbers, except of the school children. Of course I was compelled to take the names of the school children and the parents, father and mother, and then took down the names of the different ones between the ages of five and twenty-one, and when I got the family I would take the number and not the name.

Q. Do you remember the number of school children you returned between the ages of five and twenty-one?

A. It was 1,928, I think, if I am not mistaken.

Q. Can you state to the court the population of the city as found by that census?

A. I cannot exactly, it is a good while; but it was something over eleven thousand returned to the city council.

Q. You may state whether or not your recollection of these names or a great number of persons resident in that ward, and that your knowledge of them comes solely from meeting them in your official capacity as census-taker for the schools.

A. Yes.

Q. State to the court whether or not you would be able to say you know one-third of the people in that ward by name.

A. I do not.

Q. You may state whether or not you have attended the meetings in the Third ward, such as primaries and elections.

A. I have, that is pretty near all of them.

Q. State whether or not, at these meetings, you knew one-third of the people.

A. I could not call them by name.

Q. State whether or not we have not in the Third ward, and a good share of the city, a large number of foreigners, with peculiar and unusual names.

A. Yes, very.

Q. Can you say that you would be able to recall these names?

A. No, I would not. There is another thing about all the foreigners, it is a difficult matter to get the foreigners to give a correct list of the children and grown persons, because the idea is as soon as they give their names they have to pay more taxes. We have had to work very near

to get the names of the school children, and I am confident
I never did get them all.   As soon as you commence to
ask questions they think they are going to have more taxes
to pay.   I have explained it, I was going to say, a thou-
sand and one times; but I have explained it a great many
times, yet it is difficult to get a correct list of the grown
people and children.   I always explain it every time I
take the enumeration.

This testimony was not objected to and was proper
cross-examination, and so recognized by the attorneys for
the plaintiffs, who failed to interpose a single objection.

In this state cities are graded according to the number
of inhabitants contained therein.   Thus, all cities contain-
ing eighty thousand inhabitants, or upwards, are denomi-
nated metropolitan cities, and governed by a statute passed
expressly for said cities.  Cities containing more than
twenty-five thousand and less than eighty thousand inhab-
itants are denominated cities of the first class, and gov-
erned by a statute peculiar to said cities.   Cities of the
second class are of two grades, viz., cities containing more
than one thousand inhabitants and less than twenty-five
thousand, and cities containing more than five thousand
and less than twenty-five thousand inhabitants.   Each
grade of cities of this class is governed by a statute ap-
plicable to it.

In several cases which have come before this court relat-
ing to the organization of cities, the enumeration has been
taken substantially as testified to by the witness in this
case, the purpose being merely to ascertain the charter
under which the city shall act, and this, doubtless, was the
object of the enumeration ordered by the council in this
case.   This witness had peculiar advantages for ascertain-
ing who were residents of the ward in which he resides,
and of the city, yet he testifies that he did not know by
name one-third of the people in his own ward.

S. W. Dutton, a witness called by the plaintiffs, testified on his direct examination as follows:

Q. Where do you reside?

A. I reside in the city of Plattsmouth.

Q. In which ward do you reside?

A. In the Third ward.

Q. In what business are you engaged?

A. General time keeper of the B. & M. railway for the locomotive department.

Q. Do you keep the time of the workmen in the shops?

A. I supervise the keeping of the time.

Q. I will ask you about how much the force of workmen in the shop was reduced in the spring of this present year?

A. About one hundred men.

Q. About one hundred men discharged and the force cut down that much?

A. Yes.

Q. At what time was that cut made?

A. Well, I cannot say exactly what month it was; I cannot tell without referring to the books.

Q. I will ask you if it was not as early as April?

A. No, I think not.

Q. Was it in May?

A. If I recollect right it was in June. I would not be positive.

Q. I will ask you after you go from the witness stand to look that up definitely.

A. I will.

Q. The force was reduced about a hundred?

A. I judge about a hundred.

Q. How many men prior to this reduction did you have employed in the shops?

A. Do you mean on the shop roll?

Q. Yes, on the shop roll?

A. Well, there was, to the best of my recollection, something over six hundred. That is only one roll though.

Q. What other roll did you keep?

A. The engineers, firemen, and wipers' roll.

Q. That included all on what division?

A. On the whole system.

Q. From what point to what point.

A. From Denver, Colorado, to Plattsmouth, Nebraska, and from Atchison to Newcastle, the whole system west of the Missouri river.

Q. A great many of that list would be parties that did not reside here?

A. Oh yes.

Q. Do you know about how many you had upon that list of switchmen, wipers, engineers, and firemen that reside here in Plattsmouth?

A. I judge there was likely one hundred or more that resided in Plattsmouth.

Q. So you had upon your pay rolls altogether something like seven hundred men that were residents of Plattsmouth?

A. Something over seven hundred in our department.

Q. That was prior to this reduction?

A. Yes.

Q. What other department was there?

A. The store department employed about a hundred men.

Q. Did the store department employ a hundred men additional?

A. Yes, they have a separate roll.

Q. Who kept that roll?

A. That was under Weed.

Q. Don't you make it up in your general roll?

A. No, it was entirely separate.

Q. What other roll do you have?

A. The store department—the station roll.

Q. What does that include?

A. That includes all the men employed about the stations.

Q. Is the telegraph operator a station man?

A. Yes, and the employes under him.

Q. About how many did he have on this?

A. There is not so many; I judge about ten, likely.

Q. What do they do?

A. There is the agent and two clerks, and there is the baggage-master, and there are two or three men up in the store that handle freight—helpers, and two operators.

Q. About ten or a dozen of these?

A. I judge about that.

Q. What was the other roll?

A. Then there is a train service roll, and also a roll for the trackmen.

Q. How many trackmen reside here?

A. That is impossible for me it say.

Q. Are there any trackmen residing here that you know of except those that work this section from Plattsmouth to Oreapolis?

A. I have very little knowledge of the trackmen.

Q. Who keeps the list of trackmen?

A. I am not aware of the name of the party who keeps it; the foreman returns it, I suppose.

Q. Are you any way certain about the number you had upon the pay roll?

A. Yes, I am pretty sure—that is, I am reasonably sure.

Q. Will you bring into court the pay rolls for April and May of the present year?

A. I cannot do it.

Q. Where are they?

A. They are in the B. & M. office.

Q. Do you keep duplicates?

A. No, sir.

Q. In what office are they?

A. In the office of the superintendent of motor power.

Q. Do you keep a record in your office of them?

A. No other record except them.

Q. You simply make up the list and sign it.

A. I make up the pay roll.

Q. Do you keep any record in your office of the names?

A. We have a copy of the pay roll.

Q. Will you bring that into court?

A. I cannot do it.

Q. Where is it?

A. In the office.

Q. Why cannot you bring it?

A. It don't belong to me individually.

Q. You have charge of it?

A. It belongs to the B. & M. railway.

Q. You have charge of it?

A. In one sense I have; I have no right to take the records out of the office.

Q. Will you look at that record and return into court so as to swear positively to the number of men that you had upon the shop roll?

A. Yes, I can look that up.

Q. For the months of March, April, May, and June, 1889? Also, will you look over your other rolls of the motive department, or motor power; the engineers, firemen, and brakemen, and see how many you know of that were residents of Plattsmouth?

A. It is impossible for me to tell on that roll who are residents here, or who are not. It is not specified where they reside; they are kept alphabetically on the roll.

Q. Is it specified on the roll where they are to receive their pay?

A. No, sir.

Q. These train men receive their pay wherever they catch the pay car?

A. Yes.

Q. I will ask you if there are not a great many men that work in the shops, that work there a short time and go elsewhere, or whether they are stable men?

A. A great many of them—the great body are stable men—but a few are coming and going continually, but not a great many except when there is a reduction made.

Q. I will ask you if a great many of these shop men are not men that own their little homes here in Plattsmouth, and reside here some length of time?

Q. State whether or not there are men that you know have been residing here some length of time—a good many of them.

A. I cannot say as to anything like the number; I know some of them have their homes, quite a goodly number, but I have no idea what proportion to the whole number; I don't interest myself particularly about that.

Q. You have quite a number of these Bohemians that live out in the west part of the city, have you?

A. Yes.

Q. You have a large number of men that you have been acquainted with for several years?

A. There is only a small proportion that I would be personally acquainted with.

Q. I will ask you whether or not a large number, and if you have any knowledge of it, about what proportion of these men are married men living here in town?

A. I have no idea.

Q. Do you know that a large number of them are married men living in town here?

A. Certainly, I know there is a large number of married men residing here.

Q. I will ask you, Mr. Dutton, if, outside of the merchants of Plattsmouth, the larger part of the population of Plattsmouth is not made up of railroad men—shop men?    *    *    *

Q. How long have you resided here in Plattsmouth?

A. About fifteen years.

Q. You have been about the city considerably, have you?

A. Yes.

Q. And you know about all these men that work in the shops, don't you?

A. No, sir.

Q. You know of the men and their names?

A. I know the names. I know we have such men on the roll, that is all I know.

Q. Now I will ask you if, outside of the merchants and business men here on Main street, and some carpenters and stone masons, and lawyers and clerks, and such men as that—if outside of that the population of Plattsmouth is not principally made up of railroad men and shop men?

A. Why, I can only give my opinion, that likely they form about one-fifth of the population, they and their families.

Farther along in his testimony he states that the shop men and their families in his opinion compose from a fifth to a third of the population of Plattsmouth. If we take either estimate, it would give a considerably larger number of men than the votes polled at the election in question. This witness testified in substance that while he was unacquainted with certain men whose names were mentioned to him, yet for aught he knew they were residents of Plattsmouth. From the testimony of this witness and that of others, the whole number of men directly and indirectly employed by the B. & M. Railway Company who resided in Plattsmouth must have been nearly or quite 1,000.

Joseph W. Johnson, who was called as a witness for the plaintiffs, testified in substance that he had a general acquaintance in the city and had held a number of positions therein, that he had had charge of grading the

streets, etc., and a number of men were employed in that business. The exact number does not any where appear. He testified in substance that while he was unacquainted with certain persons named, yet such persons might reside in Plattsmouth without his being acquainted with them.

Some thirteen other witnesses were called who testified in substance that they were residents of Plattsmouth, and had been for some time; that they were unacquainted with certain persons whose names are mentioned, but that such persons might reside in Plattsmouth and they not be acquainted with them.

The testimony tends to show that in the years 1888 and 1889 the city of Plattsmouth engaged in the construction of a system of sewerage and paved its principal streets, and did a large amount of grading, and made other improvements. These necessarily required the employment of a large number of persons. During this time also the engineers' strike on the C., B. & Q. railway seems to have been general along the line, and the engineers and firemen in Plattsmouth, as well as other points on the line, went out and their places were supplied by others. The exact number thus affected does not appear, but evidently is quite large. And there is testimony tending to show that many of the old employes, as well as the new, had their homes in Plattsmouth.

It addition to this, it is evident from the testimony that many of the men connected with the railway company were young and unmarried. The judge evidently was aware of the fact in basing his estimate of legal voters upon the number of school children. This estimate, however, as shown by the testimony of the enumerator, is probably greatly below the actual number.

The city election held in the spring of 1889 does not appear to have involved any important matter, such as would arouse the zeal of the mass of voters, and the same is true of the election in November, 1889. A new regis-

try law had just taken effect. Registration could only take place on certain days, and many, no doubt, who were connected with train service found it inconvenient or impossible to register. Experience has shown that only where important matters of public interest are at issue can anything like a full registry of voters or of full votes be obtained. From some cause which is not fully shown a very full vote was polled throughout the entire county upon the question of issuing bonds.

A better criterion would have been the vote for president of the United States, members of the legislature, and county officers held in November, 1888, about eight months before the bond election. Such election no doubt called out the full vote of the city, and as no contests seem to have resulted therefrom it will be presumed to be satisfactory to all parties. In order to establish the fact that illegal votes were cast at an election in a specified voting precinct, proof must be offered by one or more witnesses having actual knowledge of such fact, that persons who were not legal voters did actually vote at such election, and such witness or witnesses must designate such illegal voters. When the proof merely tends to show that the witnesses do not know all the legal voters in the precinct, and therefore fails to designate certain votes as illegal, it is insufficient to authorize the rejection of such votes as illegal.

The testimony in this case tends to show that there were a greater number of adult males in the city of Plattsmouth on the day of election than there were ballots cast. In regard to the charge of repeating, it is sufficient to say that there is no proof of it whatever.

So far as appears, the Italians were legal voters and it is an uncalled for imputation to charge them with the commission of a crime without any evidence to sustain it. The only pretext for such statement is the testimony of a witness from the interior of the county who was attending the election in Plattsmouth, who testifies that in the First

ward he saw six or eight Dagos go towards the polls, but did not see them vote; he also claims that they went towards the polls two or three times, but he did not see them vote even once. He states that there was a water closet back of the building in which the election was held, and that he himself, although not a voter in that city, had just visited the water closet. He also, in effect, testifies that he would be unable to distinguish Italians from Austrians. In addition to this, this action is based upon the proposition that certain illegal votes were cast in favor of the bonds sufficient to change the result. This requires a designation of the persons who it is alleged were not legal voters. The *allegata et probata* must agree. (*Williams v. Lowe*, 4 Neb., 393; *Young v. Filley*, 19 Id., 543.) The plaintiff recognizes this rule by giving the names of 161 persons who, it is claimed, were not legal voters. There was no attempt, however, to prove that the persons named were not legal voters; that is, commencing with the first name and continuing to the last, no individual is selected and proved to have voted unlawfully.

The issue is made upon the pleadings. A party may not be able to obtain the names of all the illegal voters when the petition is filed, and hence may be unable at first to set them forth in the petition. When, however, he does obtain such names he must amend his petition to conform to what he expects to prove, so that issue may be taken thereon. The court should afford every reasonable facility to enable a party contesting to ascertain the facts as to the casting of unlawful votes. The parties, however, must act in good faith, and set forth the names of the persons alleged not to be voters. Such cases are not tried upon vague statements or charges, but by sifting the list of voters and determining who are not authorized to vote. It was the duty of the plaintiffs, therefore, to set forth the names of at least 203 persons whom they allege were not authorized to vote, and introduce proof tending

to show that each of the individuals named was not a legal voter. This they have wholly failed to do.

In *State v. Penniston*, 11 Neb., 100, it was held that a notice of contest of election which states that the contestant was an elector of the district, the points of contest, the office contested, and the date at which its duties commenced, the person selected to take depositions, and the time and place of taking the same, is sufficient. That was a contest for a member of the legislature, and after the selection of the officers before whom the testimony was to be taken, they refused to proceed upon the ground that the notice of contest was insufficient. Thereupon the contestant applied to this court for a *mandamus* to compel the officer who had entered upon the duties of his office in taking the testimony to proceed and complete the taking of such testimony. The defendant demurred to the petition and the demurrer was overruled and the officer required to proceed and complete the taking of such testimony.

It will be seen a very different question was presented from that under consideration. The rule is, that where a vote has been received at an election by officers who have conformed to the forms of law in its reception, the law will presume that the vote is legal. (*Cirencester Case*, 2 Frans. [El. Cases], 448; Orme on Election, 405; *Porterfield v. McCoy*, 1 Cong. El. Cases, 261; *Loyall v. Newton*, Id., 520; *New Jersey Case*, 2 Cong. El. Cases, 19; *Whitaker v. Cummings*, L. & R. [Mass. El. Cases], 360; 6 Am. & Eng. Ency. of Law, 428.) And this presumption must prevail in this case.

Some comment is made upon the remarks and conduct of two or three persons on election day, but no fair-minded person will charge a whole community with the trivial sayings or conduct of two or three persons. If the proof in this case was held sufficient to annul the election, it would be possible, on vague, indefinite charges, or mere

suspicion, to annul any election held in the state.  This cannot be permitted.  Elections can only be annulled for sufficient causes which are open and apparent to all and susceptible to specific proof.

The judge in the case at bar confesses that he does not know from the evidence what illegal votes were cast.  It was his duty, however, to have found what particular persons, if any, voted. illegally, specifying the names, based upon the testimony.

Upon the whole case it is apparent that the proof is not sufficient to warrant the judgment annulling the election. The judgment of the district court is therefore reversed and the action dismissed.

REVERSED AND DISMISSED.

THE other judges concur.