ADOLPH C. REXROTH

*v.*

DAVID SCHEIN.

*Opinion filed December 16, 1903.*

1. ELECTIONS—*burden of proof where illegal voting is charged.* A charge of illegal voting, made on contest, involves a criminal offense on the part of the voter and dereliction of official duty on the part of the election officers, and hence the burden is upon the contestant to overcome the presumptions of law as to the innocence of the voters and the regularity of the action of the election officials, by sufficient proof.

2. SAME—*what evidence does not show illegal voting.* Failure to find any record in the county or circuit court of naturalization papers alleged to be lost does not establish their non-existence, and consequent illegal voting, where it is proven that no record was made of many of the naturalization papers issued about the same time as those alleged to be lost.

3. SAME—*county board cannot arbitrarily change election precincts.* The power of county boards, under section 29 of the Election act, to change the boundaries of election precincts, must be exercised in accordance with the rules laid down in the succeeding section, and the latest time at which such change can be made is at an adjourned or special meeting of the board held in the month of August. (*People* v. *Board of Supervisors,* 185 Ill. 288, explained.)

4. SAME—*proof of party affiliation raises presumption that voter voted with his party.* Proof of party affiliation of a voter raises a presumption that he cast his ballot for the nominees of his political party, and, in the absence of countervailing proof or circumstances, is accepted as determining for whom such ballot was cast.

5. SAME—*when the votes of innocent electors are not rendered invalid.* Votes of innocent electors will not be held invalid because of irregularities on the part of election officials which do not change the result of the election, unless the statute declares such irregularities to be fatal.

6. SAME—*what does not affect interests of litigants on contest.* The unauthorized act of election officials in writing the name of a candidate for a certain office on each ballot to supply the omission of the county clerk to have the name printed does not affect the interests of the litigants in a contest for some other office.

7. SAME—*when ballot should not be rejected for distinguishing mark.* If it appears from the face of the ballot that marks or writings were placed thereon as the result of an honest effort by the voter to indicate his choice of candidates and not as an attempt to in-

dicate the identity of the voter, the ballot should not be rejected for candidates for whom a choice is expressed according to law.

8. SAME—*when ballot cannot be counted for either candidate.* A ballot marked with a cross in the circle at the head of one ticket and with a cross between the square and the name of a candidate for an office on the other ticket cannot be counted for either candidate for such office.

9. SAME—*erased cross in circle at head of one ticket not a distinguishing mark.* An erased cross in the circle at the head of one ticket is not such a distinguishing mark as renders the ballot invalid, where there is a cross in the circle at the head of another ticket.

10. SAME—*effect where erased cross is in a square.* A ballot marked with a cross in the square opposite the name of the candidate for the same office on each ticket, but which shows an attempt to erase the cross from one square, should be counted for the candidate whose cross is not erased.

11. SAME—*marks indicating nervousness or inadvertence do not vitiate ballot.* Pencil marks within or on the line of the circle in which the cross is marked, and which indicate nervousness or inadvertence on the part of the voter, do not vitiate the ballot.

12. SAME—*effect where cross is scratched instead of marked.* A ballot on which the cross in the circle appears to have been scratched with the wood of the pencil instead of the lead is properly counted.

13. SAME—*use of voter's own pencil does not vitiate ballot.* The use, without improper motive, of another pencil than that furnished by the election officers does not vitiate the ballot.

14. SAME—*when ballot should not be rejected.* A ballot having initials written on the dotted line below the printed words indicating the office to be filled should not be rejected, as bearing a distinguishing mark, where there was no one to be elected to such office in that precinct, which fact probably occurred to the voter after starting to write the name of some one for whom he wished to vote to fill such office.

15. SAME—*when ballot having figures on the back is properly counted.* A ballot bearing figures upon its back should not be rejected for that reason, where it is shown that one of the judges of election marked them on the ballot to keep tally upon the number taken from the envelopes as put up by the county clerk.

APPEAL from the County Court of Monroe county; the Hon. J. B. VAUGHN, Judge, presiding.

BOLLINGER, HORNER & SLATE, for appellant.

RICKERT & MORRISON, for appellee.

Mr. Justice Boggs delivered the opinion of the court:

At the general election held in the county of Monroe on the fourth day of November, 1902, the appellant and the appellee were opposing candidates for the office of county treasurer of said county,—the appellant being the nominee of the republican party and the appellee the nominee of the democratic party. The votes cast at said election were canvassed by the county clerk and two justices of the peace of the said county, and the appellant was declared to have been elected to the said office by a majority of nine votes and a certificate of election was issued to him. The appellee filed in the county court of said county a petition to contest the election of the appellant. The hearing of the issues made under the petition was had, and an order was entered finding that the appellee had received a majority of two of the legal votes cast at said election for said office, and declaring that he had been legally elected county treasurer for the county. This is an appeal to bring in review in this court such order and judgment of the county court.

A statement of the mode and manner adopted by the court and the parties in counting the ballots and in the determination of the objections is necessary to a clear understanding of our conclusions.

The appellee objected to the counting of any of the ballots that had been cast in Moredock precinct. Among the ballots cast in the other precincts in the county forty-four were found to which one or the other of the parties objected for reasons appearing upon the face of the ballots. The parties then agreed that the ballots cast in the county, other than those cast in Moredock precinct and the forty-four ballots above referred to, should be counted by the court, the right being reserved to each litigant to show that any of said ballots should finally be rejected from the count for the reason they had been cast by persons not entitled to vote. The ballots cast at

the election, excluding those voted in Moredock precinct and the forty-four ballots objected to, were then counted. Their number was 2918, and it was found that each candidate had received an equal number of them, namely 1459 each. The parties, respectively, contended that certain of the ballots included in the 2918 ballots had been cast by persons not entitled to vote. The evidence produced by the parties was heard and the various contentions passed upon by the court. The court held the votes cast in Moredock precinct should be counted, and ruled upon the many other questions hereinafter stated. Assignments as for error and cross-error have been filed. We find it will conduce to the more convenient and orderly consideration of the case to consider assignments of error and of cross-error without regard to their order.

Joseph Strodt, Charles Schallum and John Fahey, all foreign-born, deposited ballots at said election which were counted by the county court for the appellee. The appellant insists they were not legal voters. Joseph Strodt was born in Germany in 1834. His father came to the United States in 1842, and brought Joseph, then a minor of eight years of age, with him. Joseph was never naturalized, but had been informed that his father had been naturalized, and believed he had, through the naturalization of his father, the legal right to vote, and on the faith of that belief had voted at the elections in Monroe county for more than forty years. If his father became a citizen by naturalization, the status of Joseph would be that of his father by the express provisions of the Federal statutes. (Rev. Stat. U. S. sec. 2172; *Dorsey* v. *Brigham*, 177 Ill. 250.) John Fahey testified that he received his certificate of naturalization in Monroe county and had voted in that county for many years, and that his certificate had been lost or destroyed. Charles Schallum was born in Germany, and came to the United States with his father and mother while a minor. He testified that his father resided in Monroe county, and was

naturalized by order of court in that county while he, Charles, was still a minor, and that his father voted at elections held in Monroe county as a naturalized citizen, and that he had voted in that county for many years. Schallum, the father, died some twenty-seven years before the time of the hearing, and though thorough search had been made for the alleged certificate of his naturalization, it could not be found.

As the charge that Strodt, Fahey and Schallum cast illegal votes involved the charge that they had committed a criminal offense, the law raises the presumption of innocence in their behalf and casts upon the appellant the burden of proving that they were not qualified to vote. (*Behrensmeyer* v. *Kreitz,* 135 Ill. 591; *Dorsey* v. *Brigham, supra.*) The charge also involves the imputation that the election officers had been derelict in official duty in receiving the ballots of these voters. The presumption of law is that the election officers discharged their duties properly and legally, and acted correctly in receiving and counting the ballots of these voters. (*Dorsey* v. *Brigham, supra.*) It became incumbent upon the appellant, in order to justify the court in rejecting the ballots of these voters, to overcome by proof this presumption of innocence on the part of the voters and the presumption of the regularity and correctness of the official action of the election officers. As the law cast upon the appellant the burden of proving a negative, full and complete proof in rebuttal of these presumptions is not required, but in order to remove the presumptions it is necessary proof should be produced sufficient to render the existence of the negative probable. (*City of Beardstown* v. *City of Virginia,* 76 Ill. 34; *Behrensmeyer* v. *Kreitz,* 135 id. 591.) In order to overcome these presumptions the appellant produced testimony to the effect that strict and careful search had been made of the records of the county and circuit courts held in and for the county of Monroe, and that no record could be found of the natu-

ralization of the father of said Joseph Strodt, or of said John Fahey, or of the father of said Charles Schallum. Proof was, however, produced on behalf of the appellee, to the effect that prior to the year 1873 no record had been entered in the county court of Monroe county of orders for the issuance of certificates of naturalization in a great number of cases in which such orders had been made by the court. Judge Paul C. Brey testified that he was elected county clerk in 1873, and that he found the papers in as many as seventy-five or one hundred cases of applications for naturalization in which no entries of record appeared, and that the county judge then presiding ordered him to record such papers, and that he placed all that he found on the records. It was also proven that a certificate of the naturalization of Ed. Kipping, duly authenticated by the county clerk and bearing the seal of the court, issued out of the said county court of said county on the 29th day of October, 1872, and that in 1860 a certificate of the naturalization of one William Bode, also in due form and properly authenticated, issued out of the same county court of said county, and that there appeared upon the records of the said county court no record whatever of any order for the naturalization of the said Ed. Kipping or the said William Bode. All of these voters had been exercising the elective franchise in Monroe county for many years under claim of lawful right to do so. In this state of the proof we think the court, upon the hearing of this cause, was fully warranted in holding that it was most probable that certificates of naturalization issued out of the said county court of Monroe county to the said John Fahey and to the father of said Charles Schallum and to the father of said Joseph Strodt, and that the presumption that the said voters, Strodt, Fahey and Schallum, were innocent of the offense of illegal voting, and the presumption of the correctness and regularity of the action of the election officers, were not overcome.

One George Dehn voted for the appellant in Prairie du Long precinct, but the court decided his vote should not be counted because the said Dehn was not legally entitled to vote in said precinct of Prairie du Long. The statute expressly provides no person shall be permitted to vote in another precinct than that in which he resides. Dehn was an unmarried man. His father lived in New Design precinct. His brother-in-law, Stephen Reinecke, lived in Prairie du Long precinct. George had been for the past six or seven years working away from the home of his father. During that time he had worked at different times for his brother-in-law, sometimes for Valentine Braun and sometimes for Peter Braun, who also lived in Prairie du Long precinct, and for about two years had worked at Red Bud, in Randolph county, and for a short time in St. Louis, Missouri. From St. Louis he returned to the house of Valentine Braun, and was there when he cast his vote in Prairie du Long precinct, being the precinct in which said Braun resided. He testified that he considered that he had his home with his brother-in-law or with the Brauns, but he admitted that after he had been away from his father's home for three or four years, during which time he had worked for and lived with his brother-in-law and said Brauns, he voted at the presidential election in 1900 in the precinct of New Design, being the precinct in which his father lived, and he stated that he voted in New Design because he considered that his home was with his father. He further testified he had voted at five, six or seven different elections; that he had voted twice in Red Bud, in Randolph county, and at all other times in New Design precinct, and had never voted in Prairie du Long except at the election under consideration. At the September term, 1892, of the board of county commissioners of Monroe county, on the 17th day of that month, an order was entered ordering that a portion of the territory of New Design precinct be detached therefrom and attached to Prairie du Long precinct. The

elder Dehn, father of George, lived in the territory so proposed to be attached to and become a part of Prairie du Long precinct. That order, if legal, would have operated to constitute the elder Dehn a legal elector in the precinct of Prairie du Long, and if the said George Dehn regarded his home as being that of his father, as the testimony tends most strongly to indicate, he may have been induced to cast his ballot at the polls in Prairie du Long precinct because of the said order of the board of county commissioners, which purported to fix the voting place of the father in Prairie du Long. But, as we shall hereafter see, the order of the board of county commissioners was unauthorized and of no legal effect. It is a necessary constitutional qualification that an elector shall have resided in the election district for the period of thirty days, (Const. of 1870, art. 7, sec. 1,) and section 30 of chapter 46, entitled "Elections," (Hurd's Stat. 1899, p. 74,) expressly provides that no person shall be allowed to vote except in the district in which he resides. The county court held Dehn was not a legal voter in Prairie du Long precinct, and that conclusion seems to have been properly deduced from the proofs bearing upon the question.

The court, over the objections of the appellant, held Louis Teichgraeber, John Ballard and Henry Althoff to be legal voters in the precinct of Renault, where they cast ballots for the appellee. The appellant insists these voters were not residents of Renault precinct. We have carefully read the testimony as to the qualifications of these electors, and are of the opinion they were legal voters in the precinct of Renault. Teichgraeber was employed as a bar-tender in Maeyston, in Mitchie precinct, but the evidence shows he resided at the home of Joe Christ, at Ivy, in Renault precinct. John Ballard resided in Boxton, Renault precinct, and had lived there for three years. It was shown he had been assessed to labor on the highways in that precinct and that he had

paid his poll-tax there in the year 1902. His step-father lived in Missouri, and there was some proof that he spoke on one occasion of going "home" to see his parents; but this expression is not at all inconsistent with his testimony that he was a resident of Renault precinct. Henry Althoff was twenty-six years old. His father resided in Mitchie precinct, but he testified that he had had his home and claimed his residence in Renault precinct, where he had lived for seven years, and that he had never voted anywhere than in Renault. He had been absent from Renault temporarily in order to get employment, but left his belongings at his home with Mr. McClanahan, in Renault precinct.

It is insisted no distinction can be drawn between the status of Althoff and that of said George Dehn, who, as we have herein held, voted in a precinct in which he did not reside. But there are two points of difference that stand out prominently. Althoff testified that he had never claimed to reside with his father for seven years, but had during all that time claimed and had his home in Renault precinct and had always voted in Renault, and never at any other polling place. Dehn was by no means so explicit as to his intentions, but testified that at the election held in the year 1900, and some four years after it was contended that he ought to be regarded as a voter in Prairie du Long, he considered his place of residence was that of his father, and for that reason he voted in New Design precinct, and that he had never voted in Prairie du Long precinct until the election in question, which was after the county board had adopted the order purporting to transfer the territory of New Design precinct, within which territory his father lived, to the precinct of Prairie du Long. His father regarded himself as a legal voter in the precinct of Prairie du Long because of the order of the board, and voted there, and the action of George Dehn is consistent with the view that he voted in Prairie du Long in 1902 for the same reason

he voted in New Design in 1900, namely, that his place of residence was at his father's home.

Ben Busch resided and was a legal voter in election district No. 1, in Waterloo precinct. He cast his ballot for the appellee in election district No. 2, in said precinct. The county court refused to count his vote for the appellee. The statute expressly provides that no person shall be permitted to vote at any election except in the district in which he resides. His ballot was properly rejected.

At a meeting of the board of county commissioners of Monroe county held in the month of September next preceding the election here under consideration, an order was entered purporting to transfer a portion of the territory of New Design precinct to the precinct of Prairie du Long, and a number of voters who reside in the territory so purported to be transferred voted in the precinct of Prairie du Long. It is insisted the county board was wholly wanting in power to enter such order at said September meeting; that such order was void, and that voters residing in the territory purported to be transferred were not legal voters in Prairie du Long precinct. We will now consider that contention.

The county of Monroe is not under township organization. Section 29 of chapter 46, entitled "Elections," (Hurd's Stat. 1899, p. 741,) is as follows: "In counties not under township organization, the election precincts shall remain as now established until changed by the board of county commissioners, but said county board may, from time to time, change the boundaries of election precincts and establish new ones. In counties under township organization, each town shall constitute an election precinct." The phrase in said section 29, "but said county board may, from time to time, change the boundaries of election precincts and establish new ones," does not, however, invest county boards with unlimited and unrestricted power to make such changes at any and all

times, at the pleasure of the board, for the reason that the succeeding section in said chapter 46, viz., section 30, (Hurd's Stat. 1899, p. 741,) is expressly devoted to the declaration of the legislative will as to the time or times at which such changes may be made.   The two sections must be construed together, and so interpreted it will be found that the purpose of the phrase quoted from section 29 is to express that the power of the county boards to make such changes shall not be deemed to be exhausted by the exercise thereof at any particular time or single instance, but that the power is continuing and may be exercised from time to time.   Section 30, however, controls the time and manner of the exercise of the power.   The words "county board," in sections 29 and 30, and in all acts amendatory of section 30, (hereinafter referred to,) refer to the governing body of all counties of the State, whether such bodies are composed of supervisors or of county commissioners.   Clause 7 of section 1 of chapter 131, (3 Starr & Cur. Stat. p. 3835,) entitled "An act to revise the law in relation to the construction of the statutes," provides that the words "county boards" shall apply to boards of county commissioners in counties not under township organization, to boards of supervisors in counties under township organization and to the county commissioners of Cook county.

Said section 30 of said chapter 46, as amended by the act approved April 24, 1899, in part reads as follows: "The county board in each county shall, at its regular (or at a special) meeting in the month of July, 1885, respectively divide its election precincts which contain more than four hundred and fifty voters, into election districts, so that each district shall contain, as near as may be practicable, four hundred voters, and not more in any case than four hundred and fifty.   Said district shall be composed of contiguous territory, and in as compact a form as can be for the convenience of the electors voting therein.   The several county boards, in estab-

lishing said districts, shall describe them by metes and bounds and number them. And so often thereafter as it shall appear by the number of votes cast at the general election, held in November of any year, that any election district, or undivided election precinct, contains more than four hundred and fifty, the county board of the county in which such district or precinct may be shall, at its regular (or at a special) meeting in the month of July next after such November election, re-divide or re-adjust the election district, or divide such election precincts, so that no district or undivided election precinct shall contain more than the number of voters above specified. If said division or re-adjustment is not made at such July meeting, it may be made at an adjourned or special meeting of said county board, to be held in the month of August next thereafter. * * * *Provided,* that the county board may, if it deem it to be for the best interest of the voters of any town or precinct divide any election precinct which contains more than three hundred legal voters into two election precincts, same. precincts to contain as near two hundred voters as is possible." The omitted portions of the section have no relation to the power of county boards to divide or re-adjust election districts, and are omitted for purposes of brevity.

At the session of the General Assembly in 1901 three enactments, each purporting to amend said section 30, were approved on the same day, namely, May 10, 1901. These three enactments are, or may be thought to be, in some respects repugnant. Neither refers to or purports to expressly repeal the other, or to repeal section 30 as amended by the act of 1899. Whether these amendatory acts of 1901 must all fail for uncertainty or repugnancy and section 30 as amended by the act of 1899 be held to be unaffected by them and be in full force, or whether one or more of said amendatory acts of 1901 shall be held to declare the legislative will, are questions by no means free from difficulty. Interests in which neither of the

parties hereto are concerned may be affected by the decision of such questions, and the decision thereof is not here imperative.

The provisions of section 30 as amended by the act of 1899, and as purported to be amended by the three acts approved May 10, 1901, so far as such provisions relate to the power and authority of the county board to re-divide or re-adjust existing election precincts or districts during the month of September of any year, are not inharmonious. The repugnancy or uncertainty, if any there be, is in respect of other provisions of the acts. Section 30 as amended by the act of 1899, or by either of the acts of 1901, after providing that election precincts which contain more than four hundred and fifty voters shall be so divided into election districts that each district shall contain, as near as may be practicable, four hundred voters, and not more, in any case, than four hundred and fifty, and that as often as it shall appear by the number of votes cast at the general election held in November of any year that any election district or precinct contains more than four hundred and fifty voters the same shall be re-divided or re-adjusted so that no district or precinct shall contain more that four hundred and fifty voters, provides that the county board may, at the regular or special meeting to be held in certain specified months,—the month of August being the latest of the months so specified,—make such division or re-adjustment. As to the latest period of time when the power invested in the board may be exercised the various enactments are in harmony, an adjourned or special meeting to be held in the month of August being fixed in each of the various enactments as the latest period at which such action may be taken by the board. And we think this is not merely directory, but mandatory. The language employed in all of the enactments is, that the county board, if it acts at all, "shall" make the division or re-adjustment at the earlier meeting of the board

specified in the acts, and that if said division and re-adjustment is not then made, it "may" be made at any "adjourned or special meeting of said county board to be held in the month of August next thereafter." The exercise of the right of the elective franchise is involved in the action to be taken by the board. If the board should be held to possess unrestricted power to change the boundaries of election districts or precincts at any time, the power might be exercised at such time immediately preceding an election as to practically disfranchise electors by placing them in new districts or in other precincts less than thirty days before the day of election.

It is also manifest that in conferring power on county boards to make such changes, the effect whereof is to require some voters to repair to other voting places than those at which they have been accustomed to vote, it could not escape legislative consideration that it was important that the change should be made in ample time to enable those to be affected to become advised that they could not vote at their accustomed polling place, but must go elsewhere to vote. None of the various enactments we have been considering require or provide for giving the voters notice, by way of publication or otherwise, that a change had been ordered. It was clearly the legislative intent that the board should act at some of the times specified, and not, in any event, later than the month of August, in order that changes should not be made at a time which would place voters in a district or precinct less than the time required for them to be residents of such district in order to be entitled to vote therein, and also that a reasonable period should elapse between the adoption of the order making the change and the date fixed for the election, to enable voters to become apprised of the changes. The enactments read, that if county boards desire to make changes they "shall" act at specified meetings, or if they do not take action at such specified meetings, action "may" be taken at some

adjourned or special meeting to be held in the month of August. The section does not purport to give the county boards power to act at any later period than at some meeting in the month of August. Those boards are creatures of the statute, and may exercise such power only as may be conferred upon them by the legislature. The provision such boards, if they do not act at earlier meetings, "may" act at a meeting to be held in August, under a proper construction of the section must be held to imply a denial of the power to act at any later time than the month of August. No contrary doctrine is held in *People ex rel.* v. *Board of Supervisors of Adams County,* 185 Ill. 288. In that case it became the duty of the county board of Adams county, at its July meeting in the year 1899, or at some adjourned or special meeting in the month of August next thereafter, to re-divide or re-adjust the election districts of the town of Riverside, in that county, for the reason that at the preceding general election held in November, 1898, more than four hundred and fifty votes had been cast at one of the election precincts in said town. As in discharge of that duty, the county board, at the July meeting, 1899, adopted a resolution re-dividing and re-adjusting the election districts in said town, but did not properly discharge such legal duty, in that some or all of the election districts as re-adjusted contained more than four hundred and fifty voters. An original petition was filed in this court on the 6th day of December, 1899, praying that a writ of *mandamus* issue commanding the board of supervisors of said Adams county to revise their action taken at said July term and properly discharge the legal duty which then devolved upon them, and at the April term of this court, in the year 1900, we decided the cause and granted the writ, commanding said board of supervisors to revise the action taken by them at their July meeting in the year 1899 and properly and legally discharge their duty with reference thereto. The power of the board to act originally

at any other meetings than those held in the months of July and August was not involved in that case. Counsel for the board of supervisors construed the statute as we have here construed it, to deny to the board of supervisors power to re-district or re-adjust election districts except at a meeting of the board in July or August, and in support of that contention suggested that unless the statute received that construction, election districts might be changed within less than thirty days preceding the day fixed for holding the election, and voters thereby deprived of the right to vote in either the old or the new district, and also suggested that it was the legislative intent that the boundaries of election districts should be permanently fixed and known a sufficient time in advance of the day of the election to enable voters to be advised of the changes, and argued that as the board did not possess such power at later periods than in August, it was not in the power of this court to coerce the board, by *mandamus*, to act at any time after the month of August. We considered this argument of counsel, and in reference thereto said (p. 293): "If it were asked to coerce a board, by the writ of *mandamus*, to take action at a period intervening between the month of August and the date of the election to be held in November, these arguments and considerations advanced by counsel would no doubt be worthy of consideration, for courts, in granting or refusing writs of *mandamus*, exercise judicial discretion, and are governed by what seems necessary and proper to be done in the particular instance for the attainment of justice."

The action of the board of county commissioners of Monroe county, taken on the 17th day of September, 1902, was without authority of law. The board did not possess power to change the boundaries of precincts or districts at its September meeting.

Thomas Havey, August Simpson, Peter Dehn and Owen J. Fahey, who, among other voters, resided in that

portion of New Design precinct which the board of county
commissioners so illegally ordered should be attached to
and become a part of the precinct of Prairie du Long,
were permitted to and did cast ballots in the precinct of
Prairie du Long. They were not residents of the precinct
of Prairie du Long, and the county court erred in count-
ing their ballots. The three first named voted for the
appellant and Fahey voted for the appellee.

Louis Dehn and Henry Dehn voted for the appellant
in Prairie du Long precinct. The were sons of Peter
Dehn, who, as before said, lived in the territory that the
order of the county court directed should be transferred
from New Design to Prairie du Long precinct. Whether
either of them had any settled place of residence is left
in doubt by the proof. Neither appeared as a witness.
Louis was of about the age of twenty-five or twenty-six
years at the time of the election. He had not lived with
his father for five or six years or had any settled place
of abode. In 1900 he voted in New Design precinct and
in 1901 he voted in Prairie du Long, and again voted in
Prairie du Long in 1902 at the election in question. These
acts of his in voting in Prairie du Long in 1901 and 1902,
and the presumption that he voted legally, inclines us
to the view his ballot was properly allowed to remain
in the counted ballots. Henry Dehn was of the age of
twenty-three years. When he arrived at age he lived
with his father, Peter Dehn, in New Design precinct.
Since then he had not lived at any other place as a per-
manent home. There is a lack of proof to show that he
acquired any other residence. At the time of the elec-
tion in question he was at one Braun's, a relative who
lived in Prairie du Long precinct, but how long he had
been there and whether he was merely a visitor there
does not appear. His stay there was but temporary. He
then went to Randolph county, where he was at the time
of the trial. The vote deposited by him in Prairie du
Long precinct was the first cast by him. His home when

he arrived at age was that of his father.   We find nothing in the evidence to indicate that he changed it, or that he thought he had, or intended to do so.   The more consistent view is that his home was at his father's, in New Design precinct, and that he voted in Prairie du Long because he regarded his home as at his father's home, and he supposed, as did his father, that the order of the county board had transferred that portion of New Design precinct wherein his father lived to Prairie du Long precinct, and that for that reason he had the legal right to vote in Prairie du Long.   The order of the county board, as we have seen, was ineffectual to change the residence of the father, and neither the father nor the son was rendered a legal voter of Prairie du Long precinct by that order.

It was not shown for whom Henry Dehn voted.   It was proven that he was a member of the same political party of which the appellant was the nominee, and it is urged that such proof is sufficient to authorize the deduction of his vote from those cast for the appellant in that precinct.   Circumstantial evidence may be resorted to in order to purge the ballot of illegal votes.   The party affiliations of the voter have been uniformly held sufficient to raise the presumption that he cast his ballot for the nominees of the political party of which he was a member, and this proposition, in the absence of any countervailing proof or circumstances, is, it seems, to be accepted as determining for whom the voter cast his ballot. (*Sorenson* v. *Sorenson,* 189 Ill. 179; *People ex rel.* v. *Pease,* 27 N. Y. 45; *People ex rel.* v. *Teague,* 106 N. C. 576.) The ballot cast by Henry Dehn should therefore be deducted from those counted by the trial court for the appellant.

We think that the votes cast in Moredock precinct for the appellant and for the appellee were properly counted for them, respectively.   One F. J. Fischer was nominated at the precinct convention of a political party in Moredock precinct for the office of justice of the peace, but

206—7

for some reason not material to be known his name was not printed upon the official ballots. The official ballots for that precinct were prepared and printed by the county clerk and by that official were furnished to the precinct judges of election. On the morning of the election the judges of the election consulted, by means of a telephone, with the county clerk with reference to the fact that the official ballots did not contain the name of said Fischer as a candidate for justice of the peace. Afterward the judges of the election determined the name of Fischer should be written by one of the judges of the election on each of the official ballots so furnished by the county clerk, in a space left on each ballot for the name of the candidate for justice of the peace of that precinct. This action of the officials of the election was without authority of law, but however it might be regarded in a contest between candidates for the office of justice of the peace of that precinct, should such a contest arise, it is, we think, clear, to be deemed but an irregularity, affecting in no way the rights or interests of either of the parties litigant in this cause. It is a general rule that the votes of innocent electors are not to be rendered invalid by mere irregularities on the part of election officials which do not affect or change the result of the election, unless the statute expressly declares such irregularities fatal. This doctrine may be deduced from the expressions of this court in *Hodge* v. *Linn,* 100 Ill. 397, *Blankinship* v. *Israel,* 132 id. 514, *Behrensmeyer* v. *Kreitz,* 135 id. 591, *Parker* v. *Orr,* 158 id. 609, and *Schuler* v. *Hogan,* 168 id. 369, and also see 10 Am. & Eng. Ency. of Law, (2d ed.) pp. 670, 722, 766, and also McCrary on Elections, 227, 231. In Moredock precinct seventy-six votes were cast for the appellant and seventy-three votes for the appellee, and were properly so counted by the county court.

Objections were preferred by the one or the other of the parties to forty-four ballots. The original ballots so cast and objected to have been certified to this court

as part of the record herein. They are numbered consecutively from No. 1 to No. 44, inclusive. The objections urged by the appellant to ballots Nos. 4, 5, 6, 11 and 37, and by the appellee to ballots Nos. 1, 2, 7, 8, 9 and 10, are the same in character and will be considered together.

Ballot No. 1 bears the name "H. Riebling" written with a pencil in the space or margin of the ticket below the column of republican candidates, and in the same space on ballot No. 2 appear written with a pencil "H. Riebling" and "Plutoski, Jr." These two ballots were cast in Columbia precinct and were marked for appellant for county treasurer. The record shows there were vacancies in the office of justice of the peace and in two offices of constable in that precinct, and that Henry Riebling and Andrew Plutoski qualified as constables and that Louis Weihl qualified as justice of the peace as the result of the election in that precinct. The county court refused to count these ballots, regarding the words written thereto as distinguishing marks. Appellant insists that the penciled words on the tickets clearly indicated an attempt to vote for Riebling and Plutoski for constables. Below each group of candidates whose names were printed on the printed ballots were the printed words, "For justice of the peace," below which was a printed dotted line with a square at the left of the line, and also the printed words, "For constable," and below these words was also a printed dotted line with a printed square opposite such dotted line. Voters desiring to cast votes for either of those offices could have lawfully written in the name of the candidate or candidates of their choice on the dotted line or lines and placed a cross in the square at the left and in front of such line or lines. The names H. Riebling and Plutoski, Jr., were written below the dotted line, under the words "For constable," though on the margin of the ticket. Writing the name of a person, though that person be a candidate, on the sheet of paper on which the official ballot is printed, but on some other part of

the paper than that whereon the name of a candidate should appear, it cannot be denied distinguishes that ticket from other official ballots which have been prepared by the voters in accordance with the requirements of the statute. In *Pierce* v. *People*, 197 Ill. 432, we said (p. 436): "The distinguishing mark prohibited by the statute is such a mark as will separate and distinguish the particular ballot from the other ballots cast at the election. It is some sort of mark put upon the ballot to indicate who cast it and to furnish the means of evading the law as to secrecy." Therefore, not every mark made by a voter on his ballot which may separate and distinguish the particular ballot from other ballots cast at the election will necessarily result in the declaration that the ballot is invalid. If it appears from the face of the ballot that such marks or writings were placed thereon as the result of an honest effort on the part of the voter to indicate his choice of candidates among those to be voted for at the election, and that the voter did not thereby intend or attempt to indicate who voted the ballot, the ballot should not be rejected as to candidates for whom there is thereon a choice expressed in compliance with the requirements of the statute. The name of Riebling on ballot No. 1 and the names of Riebling and Plutoski, Jr., on ballot No. 2 were, beyond any doubt, written there by the voters in an honest effort to indicate the choice of the voters for the office of constable. That they, or the initials "H. A." on ballot No. 37, hereinafter considered, were intended to serve as distinguishing marks for the purpose of indicating who cast the ballots is a conjecture too remote and too highly improbable to be entertained and be allowed to operate to deprive electors of the right to vote. These two votes should have been counted for the appellant.

Ballot No. 37 bears a cross in the circle at the head of the democratic column. At the foot of the column there was printed a square and a dotted line following

it, and the words "For constable" above the dotted line.
On the dotted line were written in pencil the capital let-
ters "H. A." This ticket was also rejected by the court
from the count on the ground these initials were to be
regarded as distinguishing marks. The square and the
dotted line, and the words "For constable" above it, in-
vited the voter to write in the name of some one as his
choice for the office of constable. The manner in which
the letters are placed on the ballot by the voter indicates
to us that he wrote the letters as the initials of some one
for whom he wished to vote and by an oversight did not
complete the name, or that he changed his mind and con-
cluded not to vote for anyone for that position. There
was no constable to be elected in that precinct, and this
may have occurred to the voter, and he may for that
reason have failed to complete the name. This ballot
should have been counted for the appellee.

Ballots Nos. 4, 5, 6 and 11 were cast in Columbia pre-
cinct, where, as stated before, there were candidates to
be elected for justice of the peace and constable. On
each of these tickets the voter wrote the name of some
one of the candidates for constable. On ballots 4 and 5
the names were written on the appropriate printed dotted
line. On ballots 6 and 11 the first name of the candidate
is on the proper printed dotted line, but the surname ex-
tends, in both instances, beyond that line. The ballots
were counted for the appellee. Ballots numbered 7, 8, 9
and 10 were also cast in the Columbia precinct, and were
counted for the appellant. The names of candidates for
constable appear also written in pencil on each of these
tickets, but practically upon the appropriate lines. To
hold the names written on these tickets shall be regarded
as distinguishing marks would be wholly unjustifiable,
and would raise a rule so technical as to practically de-
feat the right of the voter to write on his ticket the name
of the candidate of his choice, though blank or dotted
lines are on the ticket for the name of such candidate.

Ballot No. 3 shows some very peculiar markings in the circle, but was counted for the appellant, and that action of the court is not assigned as for cross-error.

In the square opposite the name of the appellant on ballot No. 12 there is a distinct cross. Near the square opposite the name of another candidate for another office in which there is a cross, appears a mark made with the pencil without the square. It may have been made from a slipping of the pencil or through inadvertence. It was properly held not a distinguishing mark fatal to the ballot. The ballot was correctly held a good vote for the appellant.

On ballots numbered 13 and 18 each voter made a cross in the circle at the head of the column of republican candidates, the appellant being a candidate of that party, and between the square and the name of the appellee, in the column of democratic candidates, the voters had made a cross on each of said ballots. The county court refused to count these ballots for either of the candidates. It is urged with much force the intention of these voters cannot be a matter of doubt; that each intended to cast a ballot for each candidate in the column of republican candidates except the appellant, and that each intended to cast a ballot for the appellee for county treasurer. Such would have been the effect given to the tickets had the crosses been placed in, or substantially in, the square opposite the name of the appellee. But the crosses are entirely without and beyond the square, and conceding that the intention of the voters to vote for the appellee is very strongly indicated, still the voter did not in a legal manner indicate his intention in marking his ballot,—that is, did not make a cross in, or substantially in, the square in front of the appellee's name, but put the cross entirely without and beyond the square,—and for that reason the ballot cannot be counted for the appellee. (*Parker* v. *Orr, supra.*) Placing the cross in the space between the square and the name of

the appellee indicates plainly that it was the intention of the voter not to vote for the appellant, though he desired to vote for all other candidates of the republican party. We think the court properly refused to count these ballots for either candidate.

In ballots Nos. 14, 23, 28 and 38 crosses appear in the circle at the head of the column of democratic candidates. These ballots were cast in different precincts. In two of such ballots an attempt was made to make a cross in the circle at the head of the column of republican candidates and in each of the other two a cross in the same circle had been practically completed by the voter, but in all of these tickets the marks in the circle at the head of the republican column had been erased by the voters. These erasures were regarded by the county court as the result of an effort on the part of the voters to correct mistakes made in endeavoring to mark their ballots, and were held by the county court not to constitute distinguishing marks, and that holding was correct.

In ballot No. 31 the voter attempted to indicate his choice of candidates for every office by placing a cross in the square opposite the name of each of such candidates. An erasure in the square opposite appellee's name indicates he first made a cross in that square either by mistake or that he afterward changed his intention. He placed a cross in the square opposite the name of appellant, and voted the ticket thus marked. The distinct cross in the square opposite the name of the appellant must be held to show the intention of the voter. The county court correctly ruled the erasure did not constitute a distinguishing mark, and counted the ballot for the appellant. This ruling manifestly gives effect to the voter's intention.

In the circle at the head of the group of democratic candidates in ballots Nos. 15 and 35 the voter in each ballot first made a circle or flourish and then made a distinct and clear cross in the circle, and in ballot No. 17 a

cross appears below and in the greater part outside the circle at the head of the republican group of candidates and also a cross in the circle. These ballots were held to be valid. Nos. 15 and 35 were counted for the appellee and No. 17 for the appellant. The circular marks or flourishes were no doubt the result of the habit frequently noticed of making movements of that nature before beginning to write. The cross outside the circle was plainly an inadvertence, which the voter discovered and corrected. The court ruled correctly as to these ballots.

Ballot No. 27 has a cross in the circle at the head of the republican column and also some other pencil marks in the circle. Appellee concedes these additional marks were apparently caused by nervousness in the voter or unskillfulness, and that it ought not to be regarded as a distinguishing mark. The county court properly counted the ballot for the appellant.

The cross in the circle at the head of the democratic column in ballot No. 34 has an additional pencil mark from one arm of the cross to the lower right-hand circumference line of the circle, most probably caused by an involuntary twitching of the muscles or nerves. It was correctly counted for the appellee, and the appellant so concedes.

Ballot No. 16 has an unusually heavy penciled cross in the democratic circle, but there is nothing to indicate it was so made for any other purpose than that of plainness and certainty, and appellant so concedes. It was properly counted for the appellee.

Ballot No. 26 was counted for appellant, and appellee concedes the irregularity therein is not fatal.

Ballot No. 19 was counted for appellant. This voter indicated his choice by putting crosses in the squares. A number of the crosses made in different squares were blurred, as if the pencil had been moistened and the hand rubbed over the marks. Appellee in his brief concedes it is a good ballot.

Ballots Nos. 20 and 21 have no marks upon either of them except in the circle at the head of the democratic column. These marks are indistinct, and are visible as scratches on the paper rather than as pencil marks. They were doubtless made with the wood of a pencil that needed sharpening to expose the lead. Both were cast in Renault precinct, and no doubt the same pencil was used by both voters. A cross in each of the circles, though faint, can be discerned. The ballots were plainly cast with the intention to vote for the appellee, and were properly so counted.

Ballot No. 22 has a blue-penciled cross in the circle at the top of the democratic column. The voter did not use the pencil placed in the booth by the election officers, which made a bluish-purple mark. This ballot was cast at the polls in Renault precinct. It was in this precinct that ballots Nos. 20 and 21 were cast, in both of which the cross was found to be indistinct and but faintly discernible, as though made with a broken or dull pencil. The voter who cast ballot No. 22 at the same polls probably decided to use a pencil of his own. The use, without improper motive, of another pencil than that supplied by the election officers will not destroy a ballot.

Ballots Nos. 24, 25, 30, 32, 33, 39, 43 and 44 contained in each column two dotted lines, above one of which were printed the words, "For justice of the peace," and above the other, the words, "For constable," and also a square opposite each of said lines. These ballots were voted in precincts where neither a justice of the peace nor a constable was to be elected. On each of them a name or names of persons were written on the dotted lines. Ballots Nos. 24, 25, 30 and 43 were counted for the appellant and ballots 32, 33, 44 and 39 for the appellee. The names so written, it is thought, should be regarded as distinguishing marks. The dotted lines, with the printed words above them, on the ballots, would be understood by many voters at least to indicate those offices were to be filled

at the election and regarded as an invitation to write in the name of the person of their choice. We are inclined to think these names were put upon the ballots for that reason, and not as distinguishing marks, and agree with the trial court that they should not be regarded as distinguishing marks.

Ballot No. 29 was counted for the appellee. The intention to vote for the appellee is unquestioned, and in appellant's summary in his brief it is conceded this ballot should be counted for appellee. The irregularity in the ballot indicates only uncertainty or change of purpose in the mind of the voter.

Ballot No. 36, though objected to below by the appellee, is conceded in the brief to be a good ballot for the appellant. We so regard it. The ticket shows accidental blotting, and nothing more.

Ballots Nos. 40 and 41 were cast for the appellee in New Design precinct, on neither of which were endorsed the initials of either of the election judges. The court permitted the introduction of testimony for the purpose of proving that the ballots were genuine official ballots, and that the initials of one of the judges were omitted by mistake of the election officers. Without committing the court to the view that it is or is not competent to produce evidence for such purpose, we dispose of the question, so far as this case is concerned, by the observation that it is the opinion of a majority of the court the evidence shows no more than that it is possible that the initials were not endorsed on these tickets by the mistake or oversight of the judges. Accordingly it is held these ballots should not have been counted for appellee.

Ballot No. 42, cast in Columbia precinct, was counted for the appellant. On the back thereof appeared the figures 125. The court permitted proof to be produced to explain the presence of these figures on the ballot. Mr. Weinel, one of the judges at that polling place, testified that he wrote the figures on the ballot; that he

counted the official ballots out of the envelopes as put up by the county clerk, and put these figures on this ticket for the purpose of keeping tally of the number so taken out; that it was not numbered with the intention that any particular voter should receive it, and that he did not know to whom it was handed or by whom it was voted. In *Perkins* v. *Bertrand*, 192 Ill. 58, the judges of the election placed numbers corresponding with the number of the voter on the back of the ballots under a mistaken view that the law required ballots to be so numbered and without the knowledge of the voter, and we held the ballots were not invalidated, but should be counted. The object of our Ballot law is to secure the sanctity of the right of suffrage, and secure the free, honest and secret exercise thereof. The law was not intended to destroy the right of qualified electors, and should not be given that effect when the voter has not been guilty of any omission or wrongful act, and the failure to observe a statutory requirement by an election official appears to have been an honest mistake, which in no way affects the secrecy of the ballot. This ticket was properly counted for the appellant.

In accordance with our investigation and conclusions the count of the votes cast at the election for each of said candidates may be stated as follows:

| Rexroth, appellant | 1459 | Schein, appellee | 1459 |
|---|---|---|---|
| Votes cast for him in Moredock precinct | 76 | Votes cast for him in Moredock precinct | 73 |
| Ballots Nos. 1, 2, 3, 7, 8, 9, 10, 12, 17, 19, 24, 25, 26, 27, 30, 31, 36, 42 and 43. | 19 | Ballots Nos. 4, 5, 6, 11, 14, 15, 16, 20, 21, 22, 23, 28, 29, 32, 33, 34, 35, 37, 38, 39 and 44 | 21 |
| | 1554 | | 1553 |
| Deduct the ballots cast by George Dehn, Thomas Havey, August Simpson, Peter Dehn and Henry Dehn | 5 | Deduct the ballots cast by Ben Busch and Owen J. Fahey | 2 |
| Total legal votes | 1549 | Total legal votes | 1551 |

It thus appears the appellee received a majority of two of the legal votes cast at the election in question for the office of treasurer of the county of Monroe.

The judgment of the county court is therefore affirmed.                                  *Judgment affirmed.*