## WEBB v. BOWDEN.

### Opinion delivered February 14, 1916.

1. ELECTIONS—ACTS OF COMMISSIONERS—SELECTION OF JUDGES—UNFAIRNESS—VALIDITY OF ELECTION.—Where the election commissioners select judges for the election, under Kirby's Digest, §§ 2764, 2765 and 2800, the election is not rendered void because judges who were selected did not possess the requisite qualifications, and although the judges selected were all strong partisans of one side of the issue to be determined at the election.

2. ELECTIONS—CONTEST—LOSS OF POLL BOOKS.—In an election contest, where the poll books were lost, held, under the evidence that the contestees were not responsible for the loss of the books.

3. ELECTIONS—CONTEST—CHARGE OF FRAUD—BURDEN OF PROOF—PRESUMPTION—COUNTY ELECTION.—The returns of an election as declared by the judges are presumed to voice the will of the electorate, and any spoliation of the poll books by the election commissioners would not invalidate the election or shift the burden of proof to the contestees to show the validity of the election, and that the result as declared was correct.

4. ELECTIONS—CONTEST—SPOLIATION OF POLL BOOKS—BURDEN OF PROOF.—Even though the proof connects the contestees with the spoliation of the poll books, this would not have relieved the contestants of the burden of proving the allegations of their petition that the election returns were fraudulent and void.

5. EVIDENCE—SPOLIATION OF EVIDENCE—BURDEN OF PROOF.—The presumption arising from the fact of spoliation of evidence does not relieve the other party from introducing evidence tending affirmatively to prove his case so far as he has the burden.

6. ELECTIONS—CONTEST—FRAUD—FINDING OF TRIAL COURT.—In a contest of a county seat election, the evidence held insufficient to warrant

the disturbance of the finding of the trial court, to the effect that the election was not void, although there were some irregularities at the voting places.

7. ELECTIONS—ILLEGAL VOTES—WILL OF MAJORITY.—Although illegal votes are received at an election, or legal votes rejected, the election is not invalidated if the will of the majority is not thereby overcome.

8. ELECTIONS—CONTEST—COUNTY SEAT REMOVAL—DISCREPANCY.—In the contest of an election for the removal of a county seat, it appeared that there were 845 more votes cast in favor of removal, in a certain township, than were names shown in the printed list of those who had paid their poll taxes and were entitled to vote, it was error for the trial court to refuse to declare the law "that the discrepancy, as shown by the collector's list of poll tax payers in D. township, and the number of votes alleged to have been cast at said election, casts upon the contestees the burden of proof to show that the excess votes were qualified electors."

9. ELECTIONS — CONTEST — IRREGULARITIES — PRESUMPTION — BURDEN OF PROOF.—The presumption of the regularity and correctness of the official action of election officers is overcome when there is direct and undisputed proof of facts tending to impeach the integrity of the returns, and to show that the *prima facie* evidence of correctness is not in fact true; such proof being made by those who challenge the returns, the law then casts upon those who would be benefited by the *prima facie* returns, the burden of showing that they are in fact true and correct.

10. ELECTIONS—CONTEST—DISCHARGE OF BURDEN OF PROOF BY CONTESTANTS—PRACTICE.—In a contest of the county seat election in Hempstead County, *held*, the contestants, had, in the trial court, overcome by proof, the presumption in favor of the validity of the election; and that the burden then rested upon the contestees to account for the apparent fraud in the returns; and, *held* further, the cause will be remanded in order to give the contestees an opportunity to discharge that burden.

Appeal from Hempstead Circuit Court; *George R. Haynie,* Judge; reversed.

*Dan W. Jones, Etter & Monroe* and *D. B. Sain,* for appellants.

1. There was fraud, irregularities, misconduct of voters and judges, etc., sufficient to destroy the integrity of the returns and vitiate the election. 41 Ark. 123; 59 *Id.* 270; McCrary on Elections (2 ed.) § § 199, 303,

184, 441, 442; 86 Ark. 259; 50 N. H. 140; 63 Ill. 401; 11 Kans. 308.

2. The election judges were not appointed at the county seat. Kirby's Digest § § 2764, 2765.

3. Both sides were not represented in the appointment of judges and other officers Kirby's Digest, § 2709.

4. The place of holding the election was changed. McCrary on Elections (2 ed.) § § 114, 115; *Ib.* (4 ed.) § § 158, 160.

5. The declaration of the voter as to the fact of voting and how he voted are admissible as evidence, where the purpose is not to exclude the particular votes, but to show the existence of an unlawful combination. 41 Ark. 129, 130.

6. As to what constitutes the returns of an election, see 94 Ark. 482. The poll books, tally sheets or ballots must be preserved as prescribed by law, or they cannot be used as evidence. In this case they were not, and hence contestants failed to make even a *prima facie* case. *Ib.*

7. Excessive votes were cast. McCrary on Elections (2 ed.) § 449.

8. Fraud vitiates the returns of any precinct or ward. What proof is necessary and numerous illustrations are discussed in 86 Ark. 259; 61 *Id.* 249; *Ib.* 259; 53 *Id.* 161; 73 *Id.* 187; 21 Wis. 506; 10 A. & E. Enc. L. p. 771 (2 ed.); 12 Phila. 626. Where fraud is shown it will be presumed to be for the benefit of the party having a majority. 10 A. & E. Enc. L. (2 ed.) p. 833; Smith El. Cas. 410. It may be proved by circumstantial evidence. Cases *supra;* 10 A. & E. Enc. L. (2 ed.) p. 834 and note.

9. While township lines were proved by oral testimony, yet it was shown for many years the lines recognized by the election judges had been acted on as the true lines, etc., yet that does not excuse voters who voted in the wrong township. 75 Ark. 457; 10 A. & E. Enc. L.

(2 ed.) p. 833. Voting in the wrong township and by men who did not have a poll tax was a fraud. *State* v. *McKinley*, 120 Ark. 165; 67 Ark. 549; 97 *Id.* 221.

10. The ballots were not as prescribed by law. Kirby's Digest, § 1120.

11. While there was no proof of stealing the poll books, yet there was strong circumstantial evidence to show it.

12. It was error to refuse to declare the facts as requested by appellants.

*Jas. H. McCollum, O. A. Graves* and *T. C. Jobe,* for appellees.

1. The returns are *prima facie* true; they must be shown to be false. 50 Ark. 94; 73 *Id.* 193; 94 *Id.* 481; McCrary on Elections, § § 459, 515.

2. No fraud was perpetrated in holding the election. Fraud must be proven clearly; it is never presumed. 11 Ark. 378; 31 *Id.* 554; 92 *Id.* 509; McCrary on El., § § 569, 573; 41 Ark. 111. Not even any improper act or illegal act, knowingly or corruptly, either in holding or making returns of the election was shown. Cases *supra.*

3. Voters should not be deprived of their votes by changing township lines or change of voting place. 75 Ark. 457; 77 *Id.* 166.

4. Voters who cannot make out their own tickets are entitled to have the assistance of the judges. Kirby's Digest, § 2819. It is not fraudulent to allow votes to be cast by persons who do not show poll tax receipts.

5. Receiving or drinking whiskey by voters, unless it is shown that votes for removal were thereby influenced, is no reason for throwing out a box or votes. Ann. Cas. 1913 E. 443; 31 Okla. 304; 30 Pac. 936; 24 Okla. 707; 104 Pac. 56; McCrary on Elections, Art. 215; 6 N. M. 643.

6. The presumption is that sworn officers of an election do not violate the law. In order to cast out a ballot the proof must be clear and positive. 47 N. W.

196; 64 So. 63; 130 Pac. 405; 47 Ill. 252; 20 *Id.* 159; 108 Ark. 306; 178 S. W. 1123; McCrary on Elections, § 466a.

7.  No law was violated by the appointment of the election officers. Kirby's Digest, § § 2764, 2765, 2800; 39 Ark. 556. At least the appointees were officers *de facto.*

· 8.  The loss of the poll books or failure to preserve and return to court copies which the law requires to keep does not vitiate the election. It was not shown that contestees were responsible for the failure or loss. 53 S. E. 706; 159 S. W. 632; 16 Cyc. 1058 (6); 14 L. R. A. 471; 107 Am. St. 790. The presumption arising from spoliation of evidence does not relieve the other party from proving his case. 107 Am. St. 790; 16 Cyc. 1059 and note.

9.  All ballots "For Change" should be counted "for Hope." 51 S. W. 622; 10 Am. St. 312; 1 Bouvier 983.

10.  Upon proof of illegal voting the court will purge the poll—not throw out the box. 39 Ark. 549; 41 *Id.* 123; 43 *Id.* 67; 49 *Id.* 241; 54 *Id.* 409; 73 *Id.* 193; McCrary on El., § 523. Irregularities do not affect the returns. 32 Ark. 561; 36 *Id.* 450; 92 *Id.* 67; McCrary on El. § 225, 403; 10 A. & E. Enc. L. 766; 15 Cyc. 372 and many others.

11.  The findings of the court are conclusive as to matters of fact, if there is any evidence to support them. 104 Ark. 154; 112 *Id.* 53. Contestant's failure to specifically set up in their motion for a new trial that the findings are against the evidence was a waiver of their right to insist here that the findings are not supported by the testimony. 65 Ark. 278; 70 *Id.* 418. Their exceptions were *in gross,* not specific. 80 Ark. 528; 102 *Id.* 627; 38 *Id.* 528; 60 *Id.* 250.

Wood, J.  In pursuance of an order of the county court of Hempstead County, Arkansas, made on the 8th day of July, 1914, an election was held in the various voting precincts in that county on the 15th day of August, 1914, on the proposition of the removal of the county seat from

the town of Washington to the city of Hope, in Hempstead County. The returns were made by the judges of the election to the commissioners, who canvassed the same and declared the result of the election in favor of the removal of the county seat to Hope. The appellants, citizens and tax payers of Hempstead County, instituted this proceeding in the county court for contesting the election. There was a trial and judgment in that court in favor of the contestees, and on appeal to the circuit court the cause was heard anew in that court upon the depositions of witnesses and record and documentary evidence.

The contestants, in their petition, set forth specifically numerous grounds of illegality, irregularity and fraud on the part of the election officers, which they contend invalidated the election. These were specifically denied by the contestees.

Among other things the contestants alleged that the election commissioners, a majority of whom favored the removal of the county seat, wilfully and corruptly removed all of the regular judges of election who had been appointed at previous general elections, because they did not favor the removal, and appointed men who were in the employ of and had received money from the contestees and were strong partisans of the contestees, and failed to give contestants any representation in the appointment of the election judges, thereby perpetrating a fraud upon contestants and the citizens of Hempstead County who were opposed to the removal. They further alleged that they demanded of the election commissioners a copy of the poll books returned by the judges of election of the various wards and precincts, but that the election commissioners, under the advice of the contestees, refused to give contestants a copy of the poll books or to permit the same to be copied by them, and that contestants were therefore unable to specify and name each illegal and fradulent vote that was polled. And, by way of amendment, they set up that since the institution

of the suit to contest the election the contestees had destroyed the poll books and tally sheets of the election.

In addition to these charges of misconduct on the part of the election commissioners and the contestees, the contestants further, at great length, charged that the election judges at various voting precincts in the county, which are designated in the complaint, knowingly, wilfully and corruptly permitted and induced many illegal votes to be cast for removal in the several precincts named. In some of the allegations there is a general charge of fraud on the part of the election judges and in others the judges are charged with specific acts of fraud.

At the conclusion of the evidence the contestants asked the court to find certain facts, to the effect that as soon as the result of the election was declared by the election commissioners the contestants served them with written notice that the election would be contested and to preserve the ballots, poll books and tally sheets as evidence to be used in the contest; that the contestants requested the election commissioners to permit them to inspect and copy the poll books, which they refused; that the poll books were stolen or destroyed while in the possession of two of the election commissioners, and that the contestants therefore never had an opportunity to inspect the same, and that the commissioners failed to produce the poll books to be used as evidence in the case after demand made upon them, and failed in that respect to comply with the order of the court. The court made these findings of fact as requested by the contestants.

The contestants further asked that the court make several findings of fact, numbered from 1 to 5 inclusive, to the effect that there was such fraud practiced by the election judges at the several voting precincts in certain townships, designated, as rendered the election at those precincts void. Among these requests for findings were several covering the various precincts in DeRoan

township, in which the city of Hope is situated. The court refused to make these special findings as requested.

The court found that those who paid their poll taxes in the county for the year 1913 were 5315, and that more than 2658 qualified electors, and therefore a majority of such electors of Hempstead county voted at the election for a change and removal to the City of Hope, and entered a judgment declaring the City of Hope to be the county seat of Hempstead County, with proper orders for the removal of the county seat from the town of Washington to the city of Hope, and from such judgment this appeal has been duly prosecuted.

To sustain their allegations of misconduct on the part of the election commissioners appellants proved that two of the election commissioners were partisans of Hope, and that on the 8th day of August, 1914, they met at Hope, and, over the protest of one of the commissioners, who was not a partisan of Hope, they passed a resolution removing all of the then election judges and appointing in their stead other judges.

Appellants contend that this action of the election commissioners was illegal and a part of a pre-arranged plan to hold a dishonest election.

(1) The statute provides that the election commissioners shall meet at the court house at least twenty days prior to the general election and organize themselves into a body; that after their organization, and not less than five days before any general election, they shall appoint three judges of election for each voting precinct in the county. The statute further provides that those appointed to be judges of election shall continue to be judges of election within their respective precincts until the next general election unless sooner removed by the county election commissioners. Kirby's Digest, secs. 2764, 2765 and 2800.

The removal of the old election judges by the commissioners and the appointment of new judges, under the above provisions of the law, even though all the new judges selected were strong partisans of Hope, was

within the authority of the commissioners. The statute only prescribes that the judges of election shall be discreet persons, able to read and write the English language, and qualified electors in the precincts for which they are appointed, and that they shall not be selected from the same political party if competent persons of different politics can be found. Kirby's Digest, sec. 2799.

There is no statute requiring that the meetings of the election commissioners, after their organization, shall always be held at the court house.

It will thus be seen that the selection of the judges by the commissioners in the manner charged was not illegal, and therefore, even though the election commissioners appointed judges who were strong partisans of Hope, there was nothing in this to constitute a conspiracy on their part to hold a dishonest election. Moreover, even if the election commissioners had appointed judges who did not possess the requisite qualifications, and although they appointed judges who were all strong partisans of one side of the issue to be determined at the election, this conduct, while a manifest impropriety tending to show a spirit of unfairness on the part of the election commissioners, nevertheless did not make void the election. See *Swepston* v. *Barton,* 39 Ark. 556.

The proof showed that the election commissioners, after the election, refused to allow the contestants to inspect the poll books, and that the issue as to whether or not they could be so inspected was raised and finally determined by this court in favor of the contestants; that before this question had been determined, and while it was pending in the courts, one of the election commissioners, a partisan of Hope, in a conversation in regard to whether or not the contestants were entitled to inspect the poll books, stated "The people of Washington (the contestants) will never get them; they will never see them." It was further shown that a brother-in-law of this same election commissioner, in a conversation with a witness, was discussing the question of the right of contestants to see the poll books, and witness said to

him: "You fellows ought to show up," and he said, "It will be a cold day in August when we (meaning the contestants) would get to see them poll books." Witness asked him why contestants should not see the poll books, and he said: "They (contestees) could not afford to permit them to do so;" said, "If we do not show them then there might be two or three go to the pen, and if we were to, a whole bunch might go." The party using this language said he was in favor of the removal. This conversation was had after it was decided by the trial court that the contestants were entitled to see the poll books. Witness stated that there were several present during the conversation, and they were all jolly, laughing and talking, including the man who used the above language, but that he did not seem to be joking about what he said.

It was further shown that after it had been decided by this court that the contestants were entitled to inspect the poll books the attorneys for the contestees had requested the election commissioners to furnish them a copy of the poll books. One of the commissioners, who was not in favor of the removal, held the key to the box in which the poll books, tally sheets, etc., had been locked. Without sending for him, one of the other commissioners went to a hardware store and procured a key and unlocked the box, and he and the third commissioner were proceeding to make a copy of the poll books. They continued about this work until near half past nine or ten o'clock in the evening, and not having finished the copy, they adjourned until the next morning. Davis, one of the commissioners, at the suggestion of Cornelius, the other commissioner, took charge of the poll books, and, having the same under his arm in a brown paper, started to his home with them. It was several blocks to where he was going. He details what took place with reference to the taking of the poll books away from him as follows: "I met a man; he punched me in the side and told me to throw up my hands, and he said, 'I want that bundle.' I didn't know the man. He had his hat pulled down. He took the bundle. I didn't give him the pack-

age; he took it. I did what he told me. I was surprised;
I didn't know what it was. There was just one man. He
didn't ask for any money. What he said was. 'I want
that bundle.' "

Appellant contends that this testimony was suffi-
cient to show that the poll books were stolen by the elec-
tion commissioners, and that, when taken in connection
with the other charges of fraud and misconduct on their
part, it showed a conspiracy on the part of the election
commissioners to destroy the evidence by which the con-
testants would be able to show that the election was
fraudulent and void, and that contestees, who would
reap the benefit of this spoliation of the election returns,
should be held responsible therefor and the election de-
clared null and void on that account.

(2-4) In answer to this contention, it is sufficient
to say that the evidence would not warrant a finding that
the contestees were responsible for the loss of the poll
books. The most that could be said of it would be that
it would be sufficient to sustain a finding that the two
election commissioners who were making a copy of the
poll books were chargeable with their loss. But the evi-
dence would not warrant this court in overruling a find-
ing of the trial court to the contrary. Furthermore, even
if it had been proved that the two election commissioners
were parties to the crime by which the loss of the poll
books was brought about, still this fact would not justify
the trial court in ignoring the official returns made by
the judges of election. These returns are presumed to
voice the will of the electorate throughout the county
and any spoliation of the poll books by the election com-
missioners would not have the effect of invalidating the
election or shifting the burden of proof to the contestees
to show the validity of the election and that the result as
declared was correct. "Against a party not privy to
the destruction no prejudicial inference arises." 16 Cyc.
p. 1059, and cases cited. Even if the proof had connected
contestees with the spoliation of the poll books, this
would not have relieved the contestants of the burden of

proving the allegations of their petition that the election returns were fraudulent and void.

(5)   The rule of law applicable to such a case is well stated in *Patch Mfg. Co.* v. *Protection Lodge,* 77 Vt. 294, 60 Atl. 74, 107 Am. St.'Rep. 765 at p. 790, as follows: "The presumption arising from the fact of spoliation of evidence does not relieve the other party from introducing evidence tending affirmatively to prove his case so far as he has the burden. It cannot supersede the necessity of other evidence. The presumption is regarded as merely matter of inference in weighing the effect of evidence in its nature applicable to the question in dispute." *Cartier* v. *Troy Lumber Co.* 14 L. R. A. 470-471; 16 Cyc. 1058, 1059.

It follows that the court did not err in refusing the following request for a declaration of law: "The conduct of the election commissioners in destroying the poll books and other election returns rendered such returns void, and throws upon the contestees the necessity of showing what votes were cast in DeRoan township, and by whom."

It is unnecessary for us to set out and discuss in detail the evidence concerning the alleged fraud on the part of the judges of election at the various voting precincts outside of DeRoan township. It would extend this opinion at great length to do so. It suffices to say that we have carefully examined the same and have reached the conclusion that the court did not err in refusing to make the findings requested by the appellants to the effect that the conduct of the judges of election in these several precincts resulted in permitting illegal votes and was such fraud as vitiated and destroyed the result of the election as shown by the returns from those precincts.

(6)   While certain irregularities were shown at many of these voting places, we do not feel warranted in holding as a matter of law that there was no substantial evidence to sustain the finding of the trial court to the effect that these irregularities did not render the entire election returns at those places void. The most that could be said of the conduct of the election judges at the

various precincts outside of DeRoan township is that it was irregular in some particulars which resulted in permitting some illegal votes to be cast. But the evidence does not show that there was such a system of illegal voting permitted by the election officers as indicated that they knowingly perpetrated illegal acts in connection with the election, such as constituted a fraud in holding the same and vitiated the entire returns from those precincts. At least we are not warranted in overturning the finding of the trial court holding in effect that there was no such fraud in these precincts as vitiated the entire returns therefrom, and such as rendered the election therein void.

This court, in *Freeman* v. *Lazarus,* 61 Ark. 247, 257, quoted approvingly the following from McCrary on Elections, sec. 539: "If an officer is detected in a willful and deliberate fraud upon the ballot-box, the better opinion is that this will destroy the integrity of his official acts, even though the fraud discovered is not of itself sufficient to affect the result. The reason of the rule is that an officer who betrays his trust in one instance is shown to be capable of defrauding the electors, and his certificate is good for nothing."

(7) Having in view this rule, we do not find in the conduct of the election judges in the voting precincts outside of DeRoan township any evidence of a willful and deliberate fraud upon the ballot. The irregularities on the part of the election officers, resulting in the illegal votes that were cast in those precincts, should only result in purging the returns of such illegal votes. But if the returns had been purged of all the illegal votes shown to have been cast in those precincts, it could not have affected the general result. "It is no valid objection to the election that illegal votes were received or that legal votes were rejected if they were not numerous enough to overcome the majority." *Swepston* v. *Barton, supra.*

"Frauds of individual voters and the casting of unqualified and fraudulent votes do not vitiate the returns unless the officers are parties thereto; but, in such cases,

the returns are accepted and purged of the illegal votes."
*Schuman* v. *Sanderson,* 73 Ark. 187-193.

"Where an election has been legally held and fairly
conducted nothing will justify the exclusion of the vote
of an entire precinct except the impossibility of ascer-
taining for whom the majority of the votes were given."
*Dickson* v. *Orr,* 49 Ark. 241.

This brings us to a consideration of the question as
to whether the court erred in refusing to make the find-
ings of fact requested by the appellants numbered 16
to 21, inclusive, to the effect that the election returns in
various voting precincts of DeRoan township were fraud-
ulent and void and should be thrown out. In this con-
nection, the court made the following finding of fact:
"That the paid poll tax receipts as shown by the collector
of Hempstead County, Arkansas, for the year 1913, for
DeRoan township, in said county, were only 1299 and at
the county seat election held for removal of county seat
on the 15th day of August, 1914, the judges of the various
wards and precincts in said DeRoan township, as shown
by the certificate of the county election commissioners;
that 2144 votes were cast on the question of removal,
and 13 against removal, leaving a majority of 2131 votes
for removal in DeRoan township."

The undisputed evidence showed that at the general
election in September, 1912, there was a total of 905 votes
cast in DeRoan township. They were distributed accord-
ing to the voting precincts as follows:

> 270 votes cast in Ward 1;
> 114 " " " " 2;
> 48 " " " " 3;
> 114 " " " " 4;
> 294 " " at Bridewell's office
> box, and
> 65 votes cast at Shover Springs.

At the general election subsequent to the county seat
election, held in September following, it was shown that
the greatest number of votes cast for any state officer

without opposition was 838, and that the total votes cast for governor, including all of the votes that were cast for each of the party candidates in that election, was 814. The 838 votes were distributed in the different wards and precincts as follows:

226 votes cast in Ward 1;
120 " " " " 2;
86 " " " " 3;
124 " " " " 4;
235 " " at Bridewell's office box, and
47 votes cast at Shover Springs.

The 2131 votes that were cast in DeRoan township for removal of the county seat, as shown by the election returns, were distributed in the various wards and precincts as follows:

617 votes in ward 1;
359 " " " 2;
113 " " " 3;
366 " " " 4;
596 " " at Bridewell's office box, and
80 votes cast at Shover Springs.

These, with the 13 votes that were returned as against removal, made the total of 2144 votes cast in DeRoan township.

There was evidence on behalf of the contestants to the effect that parties were permitted to vote at the various voting precincts in DeRoan township who were not qualified electors. For instance, it was shown that at Bridewell's box several persons voted who did not live in that voting precinct and in a different township; that they were permitted to vote without being asked questions. It was shown on cross-examination of these witnesses that they lived near the line between Ozan and De-Roan townships, and most of them had been in the habit of voting in DeRoan township, but had voted at times in Ozan township. They were "liners." At this box a

minor was permitted to vote without being asked any questions. One voter lived close to the town of Washington, but voted in DeRoan township. The judges asked him no questions. Another witness who did not live in DeRoan township told the judges the place where he lived, but they asked no questions as to the township. Another witness voted there, stating that one of the judges knew where he lived; that the judges told him to vote there. He had voted before in DeRoan township, but did not live in that township.

Another witness testified that he was a timber man from Louisiana. He had been in Hope six or seven days; thought his home would be in north Arkansas. He went in and they took his name and he voted "for the court house to come to Hope." He voted at that election just because he was asked to vote. He first tried to vote at Ward 3. The fellow at the gate told him that they wanted to do the right thing, and told him to go over to the other ward closer to where he lived and vote. The judges at the ward where he voted asked him no questions whatever as to his qualifications. He had paid no poll tax. The judges made out the ticket. The ticket was made out right there by the box where they deposited the vote, at the table where the men sat all the time. He never had the ticket in his hands and did not see them deposit the ticket in the box.

Another witness testified that he came from Louisiana on the 4th or 5th of August. His home was in Texas. He voted in Hope at a box just below the Capital Hotel, near the depot. He had never paid a poll tax in Arkansas. A fellow called him in there and asked him if he wanted to vote, and witness told him he did not have a poll tax receipt, and the man said it didn't make any difference, and asked him, "Do you want the court house to come to Hope?" Witness replied, "Yes, I guess so." The man made out a ticket for witness and handed it to the fellow that was over inside at a desk. It was the man in the inside of the house that called witness in. Witness did not know whether he was

one of the judges of election or not, but he was the man that made out the ticket. The man that sat at the table made out their tickets.

Another witness, a brother of the last witness, testified substantially to the same effect, except that he had come from Missiouri and had arrived at Hope three or four days before they voted him. Stated that he and his brother were standing in front of the polls and some fellow came to the door and invited them in and asked them if they wanted to vote. Witness replied that he had no poll tax receipt, and the man said that didn't make any difference, to come and vote anyway. Witness on that occasion was on a visit to his brother-in-law, who lived in Hope. He stated that the man who invited them in went back and got a ticket and made it out. "They asked me to vote for Hope. He signed my name and wrote something on the ticket." Witness could not say what the man did with the ticket. The deputy sheriff at that box on that day, who was around or near the voting place all day, testified, denying the testimony of the last two witnesses above mentioned.

It will be observed that at the Bridewell box at this the county seat election, there were 596 votes.

It was shown that at Ward 3, in the city of Hope, there were 34 votes cast of persons whose names did not appear on the printed list of those who had paid their poll taxes for the year 1914.

It was shown that in Ward 2 a minor voted who was 20 years old in December after the election. The witness testified that they asked him if he was twenty-one and he told them that he was going on twenty-one. That was all that was said, and they did not swear him; said he knew all the judges and clerks. Witness did not see the judges put the ticket in the box; he saw them write his name on the poll books. Witness weighed 137 pounds and was five feet seven and a half or seven and three-quarters inches in height. This witness voted for removal.

Another witness, who was 21 years old in November following the election voted for removal, stated that the judges asked him no questions.

(8)   We have set forth the above testimony because it tends to throw light upon the conduct of the officers conducting the election at the various precincts in DeRoan township; and while this testimony of itself would not be sufficient to overcome the finding of the trial court to the effect that there was no fraud upon the part of the election judges in DeRoan, at least no such evidence of fraud as would justify throwing out or excluding from the count the entire vote of DeRoan township, as shown by the returns of the election officers, yet this testimony, when taken in connection with the undisputed evidence showing that there were 845 more votes cast for removal of the county seat to the city of Hope than were shown on the printed list of those who had paid their poll taxes and were entitled to vote, convinces us that the court was in error in refusing appellant's prayer for declaration of law No. 3, as follows: "The court declares the law to be that the discrepancy as shown by the collector's list of poll tax payers in DeRoan township and the number of votes alleged to have been cast at said election, casts upon the contestees the burden of proof to show that the excess votes were qualified electors."

In *Powell* v. *Holman,* 50 Ark. 85-94, we said: "The duly certified official returns of election officers are not subject to the same rules of suspicious reflections and doubtful imputations as attend the ballots under certain circumstances.   The official returns are quasi-records and stand with all the force of presumptive regularity, and *prima facie* integrity, not only till suspicion is cast upon them, but until their self-authenticated verity is overcome by affirmative proof that they do not speak the truth. These returns may be impeached by any legitimate evidence, showing that they do not speak the truth, and when so overcome, they lose their character as evidence, and thereupon, other sources must be looked to for testi-

mony in ascertaining and establishing the result of the vote. Had it been shown by appellee that fraud, unfairness or illegal voting attended the election, entered into and became a part of the official count, and thus involved the correctness of the certified returns; * * * or any other legitimate proof, tending to impeach the verity of the returns so placed in evidence, then the trial court might have found specially, that the presumption of credit and *prima facie* truthfulness which the law gives to the official acts and returns of election officers, had been overcome.''

(9) It is familiar doctrine, as announced by this court in many cases, and as late as *Letchworth* v. *Flinn,* 108 Ark. 301-306, ''that where it appears that a person was registered, or that his vote was accepted by the election officers, there is a presumption, in the absence of proof to the contrary, that such person was a qualified voter.'' But it is equally well settled by the authorities that the presumption of the regularity and correctness of the official action of election officers is overcome when there is direct and undisputed proof of facts tending to impeach the integrity of the returns and to show that the *prima facie* evidence of correctness is not in fact true. Such proof being made by those who challenge the returns, the law then casts upon those who would be benefited by the *prima facie* returns, the burden of showing that they are in fact true and correct.

The law is well expressed by the Supreme Court of Illinois in *Rexroth* v. *Schein,* 69 N. E. 240-242, as follows ''It became incumbent upon the appellant, in order to justify the court in rejecting the ballots of these voters, to overcome by proof this presumption of innocence on the part of the voters and the presumption of the regularity and correctness of the official action of the election officers. As the law cast upon the appellant the burden of proving a negative, full and complete proof in rebuttal of these presumptions is not required, but, in order to remove the presumptions, it is necessary proof should be

produced sufficient to render the existence of the negative probable." Citing cases.

Mr. McCrary lays down the law and gives an illustration applicable to the facts of this record as follows: "Every circumstance which tends to show that an election was fradulent may be proven, and the court must determine, from all the evidence, whether fraud has been shown. As, for example, if the aggregate vote cast is largely in excess of the number of legal voters resident in the precinct, or if the vote cast at the election in question is largely in excess of the vote cast at any previous or subsequent election, such facts as these, if unexplained, will often establish the fact that frauds have been perpetrated and illegal votes cast, and make it necessary to throw out the poll altogether, unless it can be sifted and purged.

"While it is true that mere irregularities in the conduct of an election, where the will of the voter has not been suppressed or changed, will be disregarded, yet a succession of unexplained irregularities, and a disregard of law on the part of the officials, is sufficient to deprive the ballot box and the returns of the credit to which they are otherwise entitled, and shift the burden upon the party maintaining the legality of the official count." McCrary on Elections, secs. 582, 583.

In *Todd, et al*, v. *Cass County*, 47 N. W. 748, the following language, applicable in that case is also exceedingly apposite to the facts under review in the instant case "Had proof shown that the number of votes cast in 1887 and in 1888 were but 1300, and that the number of votes cast at the general election in 1889 were about 1300, and that this number at the bond election, June, 1889, had been swelled to more than 2200, the conclusion would be almost irresistible, in the absence of proof explaining such votes, that the increase had been obtained by fraud. * * * Where, however, a city or precinct without adequate cause shows a grossly excessive vote, which is unexplained, it may be cause for reducing the vote to the ordinary, average limit, or, if it cannot be separated,

and it is clearly apparent that fraud has been perpetrated, rejecting it altogether.''

Appellees' counsel urge that the official list of poll tax payers cannot be accepted as the correct number of legal voters because persons may have paid their poll tax whose names were not put on the official list, and because such list would not show the names of minors who became of age since the first Monday in July previous, when the official list was made up, and because such list would not show the names of those voters who may have moved from other counties of the State into Hempstead six months and into DeRoan township, thirty days, before the election.

(10)  A complete answer to that argument is that contestants have adduced proof which makes it probable that the excessive vote in DeRoan township, over the official list of qualified voters, did not occur in any of the legitimate ways suggested.  Contestants have proved by the figures set out above that at nearly all of the voting precincts in DeRoan township the vote at this special county seat election was more than double that of the vote in these precincts at the general election of 1912, and also at the general election of 1914, which occurred about a month after the special election.  It is a matter of common knowledge that at general elections, where there are candidates of opposing parties, and especially in presidential years, as was the year 1912, the interest of the entire electorate is stirred and they are usually brought to the polls in full voting strength.  Contestants also showed by affirmative evidence that the judges of election in DeRoan township permitted a considerable number of illegal votes to be cast.  Whether this was done through negligence or corruption on the part of the judges is immaterial, as contestants have proved that there was a difference of 845 votes between the official list of poll tax payers and the election returns of DeRoan township.  The testimony thus adduced by contestants was sufficient to render it probable that the disparity shown between the official list of poll tax payers and the

official returns of the election judges was caused by illegal voting. Contestants, therefore, have fully met the requirements of the rule heretofore announced, placing upon them the burden of proving a negative, that is, of overcoming the presumption of the *prima facie* correctness of the official returns.

Contestants having adduced affirmative proof to this effect, it was then incumbent upon the appellees to explain how this excessive vote between the official list of poll tax payers and the official returns occurred. Appellees did not attempt to show by the election judges themselves, or otherwise, any facts that would warrant the learned trial judge in finding that the 845 votes could be accounted for by any of the legitimate methods now suggested in the brief of counsel for the appellees. The court could not find that such was the case without any evidence upon which to base such finding. So the affirmative evidence on the part of the contestants has impeached the integrity of the official returns from DeRoan township, and the trial court erred in not so holding, and these returns cannot now be considered in the count, which would result in favor of the county seat remaining at the town of Washington.

But as it has been suggested by appellees that it might have been shown in the manner indicated that these returns were indeed correct, and as it is manifest that the evidence has not been fully developed along these lines, the appellees should be and will be given the opportunity on a new trial to purge the official returns of DeRoan township and to lift the cloud that now hangs over them. See *Rhodes* v. *Driver,* and *Lovewell* v. *Bowen,* 69 Ark. 501-511.

Since the court, in addition to certain special findings, also made a general finding and holding in favor of the appellees and against the contestants, the general assignment in the motion for a new trial that the verdict is contrary to the law and the evidence, was sufficient to challenge the correctness of the finding and judgment of the court.

For the errors indicated, the judgment is reversed and the cause will be remanded for a new trial.

McCULLOCH, C. J., dissenting. The following words of warning were written by Judge McCrary in his work on Elections, section 523: "The power to reject an entire poll is certainly a dangerous power, and though it belongs to whatever tribunal has jurisdiction to pass upon the merits of a contested election case, it should be exercised only in an extreme case, that is to say, a case where it is impossible to ascertain with reasonable certainty the true vote." These words find echo in the following statement by this court in *Wheat* v. *Smith,* 50 Ark. 266: "Elections are not to be lightly set aside, though the law has not been strictly complied with."

The majority have, in their decision, overturned not only the certificate of the sworn election officials, but the findings of fact made by the circuit judge in drawing the inferences from the evidence adduced before him. The rule as to conclusiveness of the findings of the trial court upon conflicting evidence applies to a contested election case. *Schuman* v. *Sanderson,* 73 Ark. 187.

It seems to me that the court has done violence to the utterance in *Powell* v. *Holman,* 50 Ark. 85, as follows: "The duly certified official returns of election officers are not subject to the same rules of suspicious reflections and doubtful imputations as attend the ballots under certain circumstances. The official returns are *quasi* records and stand with all the force of presumptive regularity, and *prima facie* integrity, not only till suspicion is cast upon them, but until their self-authenticated verity is overcome by affirmative proof that they do not speak the truth."

The effect of the decision in the present case is to hold that the validity of the certificate of the election officers, concerning the number of votes that were cast at the election in August, 1914, is overturned by the county clerk's certificate of the number of poll taxes paid the preceding year in DeRoan township. It is conceded that the other facts proved by the contestants do not establish fraud conclusively, and that testimony can not

be pieced together with the conflict between the two certificates in order to set aside the trial court's finding of fact. The turning point of the case then comes down to this: Does the prior certificate of the clerk, concerning the number of poll taxes paid, as a matter of law overturn the apparent conflicting certificate of the election officers? I say that it does not. The two certificates are of equal dignity. The first was based upon and related back to an assessment of taxes made more than a year before this election was held, and there being more than a year intervening, the presumption of regularity ought to attend the last certificate, which was that of the election officers, until it is overturned by sufficient evidence. At least, it ought to, and does in my judgment, raise such a presumption as, in the absence of proof, the trial court is authorized to draw the inference of regularity.

The discrepancy is indeed large, but we have authority for the application of the rule of presumption concerning a much larger discrepancy than that. *Todd v. Cass County,* 31 Neb. 150, 47 N. W. 196. The intervening period of time between the original assessment for taxes in the year 1913, and the election held in August, 1914, was sufficient to make it possible for there to have been a substantial increase in the number of voters. This could have been brought about by the coming of age of young men, and the removal of voters into the township from other sections of the State, inside as well as outside of the county. There was no proof offered on this score, but the trial court had the right, in determining what inferences to draw from the two conflicting certificates, to find that it was possible for the number of voters to have been very substantially augmented. In addition to that, there may have been many mistakes in the original assessment rolls as to the residences of voters, whether in the school districts composing that township or in other portions of the county; and also mistakes of the collector in registering the paid poll taxes. It is true that there was no proof introduced on that subject, and the court's

opinion constitutes an imposition on the contestees of the duty of making that proof.

It is said in the opinion of the majority that when it appeared that the certificate of the election officers was in conflict with the prior certificate of the county clerk, the burden of proof shifted to the appellees to make an affirmative showing of the correctness of the last certificate. I do not think that is the correct statement of the law, for the burden of proof does not shift. It abides throughout the trial with the contestants, upon whom rests the duty of establishing the affirmative of the issue which they present. The statutes of this State declare that "the party holding the affirmative of an issue must produce the evidence to prove it," and that "the burden of proof in the whole action lies on the party who would be defeated if no evidence were given on either side." Kirby's Digest, § § 3106-7.

In the American and English Encyclopedia of Law (Vol. V, page 22) the rule with respect to the burden of proof is stated as follows: "The burden of proof in the sense of the duty of producing evidence passes from party to party as the case progresses, while the burden of proof meaning the obligation to establish the truth of the claim by a preponderance of evidence rests throughout upon the plaintiff; and unless he meets this obligation upon the whole case, he fails." That rule has been adopted in several well considered cases. *Egbers* v. *Egbers,* 177 Ill. 82; *Supreme Tent Knights of Maccabees* v. *Stensland,* 206 Ill. 124; *Maxwell* v. *Wright,* 160 Ind. 516; *Shepard* v. *Western Union Tel. Co.,* 143 N. Car. 244; *Boardman* v. *Lorentzen,* 155 Wis. 566. The rule is also stated substantially the same in Ruling Case Law, Vol. X, page 897: "Generally speaking, the burden of proof, in the sense of the duty of producing evidence, passes from party to party as the case progresses, while the burden of proof, meaning the obligation to establish the truth of the claim by a preponderance of evidence, rests throughout upon the party asserting the affirmative of the issue, and unless he meets this obligation upon the whole case he fails.

This burden of proof never shifts during the course of a trial but remains with him to the end.''

Now, the application of that rule to the present case it seems to me is this: Conceding that the production of the prior certificate made out a *prima facie* case in favor of the contestants, which, unless overcome, warranted the inference of the falsity of the last certificate, and in that sense the burden was shifted to the contestees, yet the burden upon the whole case of establishing the affirmative of the issue was upon the contestants, and as long as it was impossible to draw different inferences of fact from the conflict in the two certificates it was within the province of the trial court to determine which of the inferences should be drawn. The findings of the trial court, based upon legitimate inferences, should not be overturned because, as has already been decided by this court, there is a conclusive presumption in favor of the findings of the trial court if there was evidence upon which it is based.

Even if there was an irreconcilable conflict between the two certificates, why should we say that the circuit court erred in concluding that the certificate of the election officers was correct and that the former certificate of the clerk concerning the number of poll taxes was incorrect. Is that consistent with the oft repeated rule that the official returns are *quasi* records and stand with all the force of presumptive regularity and *prima facie* integrity, not only till suspicion is cast upon them, but until their self-authenticated verity is overcome by affirmative proof that they do not speak the truth? But the two certificates are not in irreconcilable conflict, for it is possible to harmonize the two upon the assumption that the number of qualified electors had increased by reason of the coming of age of young men, and removals into the precinct. It was the duty of the circuit judge to reconcile those two certificates if possible to do so, and I do not think that we ought to say, as a matter of law, that the circuit court erred simply because the contestees failed to introduce proof tending to show that there had been

an increase in the number of voters. As long as the certificate of the election officers bore the verity which the law says shall be attached to it, it cast upon the contestants the burden of offering proof tending to show that there had been no change in the number of voters since the last assessment. That was not compelling them to prove a negative, but to offer proof which overcame the *prima facie* case made out by the certificate of the election officers.

Some significance is attached, in the opinion, to the fact that there were more votes cast at this election than at the last preceding general election and the next succeeding one, and the majority of the judges expressed the view that there is more interest manifested at general elections than at a special election of this kind. I think it may be stated to be a matter of common knowledge, at least in Arkansas, that no kind of an election excites keener interest than a contest over the removal of a county seat. It is a matter of common knowledge, too, that in this State a nomination by the dominant political party is equivalent to an election, and that there is comparatively little interest manifested in the general elections. Therefore I think the fact that the vote in the general elections, preceding and subsequent, falls short of the number of votes cast at the special election, which is being contested, ought not to be cast into the scales against the contestees so as to make them account for the discrepancy.

This case seems to have received the most painstaking care and attention of the trial judge, and I am unwilling to say that he erred in refusing to declare as a matter of law that the discrepancy between the two certificates concerning the number of poll tax payers in that township made out an undisputed case of fraud which destroyed the integrity of the polls. I dissent, therefore, from the conclusions of the majority.